737 So.2d 706 (1999)
Ann Lang FITZGERALD
v.
Thomas C. TUCKER, et ux.
No. 98-C-2313.
Supreme Court of Louisiana.
June 29, 1999.
*709 Richard P. Ieyoub, Attorney General, John Henderson Ayres, III, Counsel for Applicant.
Carl William Robicheaux, Lafayette, Counsel for respondent.
CALOGERO, Chief Justice.[*]
We granted a writ in this case to determine whether defendant is liable to plaintiff for defamation. After a thorough review of the record, we reverse the portion of the court of appeal's judgment affirming the district court's award of damages for defamation, because we find that statements made by defendant during a television interview were not actionable as a matter of law, that plaintiff failed to prove defendant uttered allegedly defamatory statements during a meeting of the Acadiana Council on Addictions, and that plaintiff failed to allege in her petition any other defamatory statements spoken or written by defendant. In so holding, we find it unnecessary to analyze a number of issues considered by the court of appeal, such as whether plaintiff was a private figure, whether the jury was properly instructed about the degree of fault which a private plaintiff must prove to recover for publication of defamatory statements regarding matters of public concern, and whether plaintiff's award of damages for defamation should have been modified upward.
The events preceding the filing of this lawsuit arose out of Ann Lang Fitzgerald's and Thomas C. Tucker's involvement with the Louisiana State Board for the Certification of Substance Abuse Counselors, the state board authorized to test and certify substance abuse counselors. Initially, Fitzgerald worked for the Board as the administrative assistant to Donald Trahan, the former executive director. After Trahan and his secretary resigned, Fitzgerald, beginning June 1, 1992, assumed the role of the Board's administrative director. As administrative director, one of Fitzgerald's official duties was to notify certified substance abuse counselors of complaints filed against them. Fitzgerald was also responsible for having counselors' certificates of eligibility executed. In her capacity as administrative director, Fitzgerald worked alone at the Board's office for approximately five months until she resigned on November 2, 1992, the day that Tucker became the Board's chairman. Before being elected chairman, Tucker had served as one of the Board's members and chairman of the Board's ethics committee.
The significant events in this case occurred before and after November 2, 1992. Before November 2, while employed at the Board, Fitzgerald had earned her own substance abuse counseling certificate. Charged with having the certificates of eligibility duly executed, Fitzgerald took her certificate, along with sixteen others, to Charles Broussard for his signature. Broussard, a prior Board member, had not been on the Board for over four months at the time he signed the certificates. He testified that he discussed with Fitzgerald the propriety of his signing the certificates, inasmuch as he was no longer a Board member, but signed them anyway. Also, on October 30, 1992, the day before Tucker was elected chairman of the Board, *710 Fitzgerald notified Karen Tucker, who is the defendant's wife and a certified substance abuse counselor, that Stepping Stones to Recovery had filed an ethics complaint against her. At the time the complaint was filed, Fitzgerald's husband, attorney D.S. "Terry" Fitzgerald, represented Stepping Stones. In fact, Fitzgerald's husband signed the ethics complaint against Karen Tucker.
In the weeks following November 2, 1992, the day that Fitzgerald resigned and Tucker assumed office, Fitzgerald began working as a substance abuse counselor at the University Medical Center ("UMC") in Lafayette on the same floor as Karen Tucker. Thomas Tucker, on the other hand, began his work as chairman of the Board, at which time he discovered that seventeen certificates bearing Broussard's signature had been affixed by Broussard after he was no longer a Board member. Tucker discovered, in addition to the improperly executed certificates, that Board minutes were unsigned and that financial and personnel records were missing. Consequently, Tucker telephoned the Lafayette district attorney's office regarding the missing records and unsigned Board minutes. Tucker also talked with the Department of Health and Hospitals, the Office of the Legislative Auditor, and the Office of the State Inspector General. Upon instruction from the Inspector General, Tucker sent a form letter to each of the seventeen holders of the improperly executed certificates, requesting that their certificates be returned to the Board. The letter stated that the certificates were being collected so that they could be destroyed, and that replacements would be issued as soon as possible. Only after obtaining a temporary restraining order and receiving her new certificate did Fitzgerald return her invalid certificate to the Board. Despite numerous representations by Tucker to Fitzgerald that her old certificate would be destroyed, her certificate, along with the other returned certificates, was maintained at the Board's office.
Tucker's observations prompted a legislative audit. Daniel G. Kyle, who is the Legislative Auditor and a certified public accountant, conducted the audit, which covered the Board's activities for the two fiscal years ending June 30, 1992. In his final report, Kyle outlined the Board's deficient administrative and financial management activities during that period.[1] Fitzgerald served as the Board's administrative director for one month of the period covered by the audit (June 1992), and, although no individuals were mentioned in the audit, Fitzgerald's activities at the Board were called into question in the audit report. Fitzgerald never filled out any employment forms, kept her own time sheets, and signed her own paychecks. She kept pre-signed checks in her office, and from them issued checks to her husband for the rental of his office equipment to the Board. Her husband also billed the Board for legal services, including consultations with Fitzgerald. In one of those *711 invoices, Fitzgerald's husband apparently billed the Board for reviewing the ethics complaint which he filed on behalf of Stepping Stones.
Prompted by the public release of the legislative audit, Charles Huebner, a television news reporter associated with KLFY Channel 10 in Lafayette, conducted a twenty-minute, video-taped interview with Tucker at the Board's office. The interview, which Huebner later edited down to two minutes of airtime, was broadcast on June 11, 1993. During the two-minute broadcast, Huebner questioned Tucker about the various findings of the legislative audit, including the Board's inability to account for previously issued certificates and the improperly executed certificates. As the discussion regarding certificates progressed, Tucker briefly held up Fitzgerald's certificate, which displayed her name. After Tucker lowered the certificate, removing Fitzgerald's name from the camera's view, Huebner briefly gestured downward to the certificate with his hand, and asked Tucker whether "there could be people out there masquerading as substance abuse counselors." Tucker responded that "that could be happening." Huebner, again briefly gesturing with his hand to the out-of-view certificate, asked Tucker whether he had "any idea how many bogus ones are out there." Tucker responded negatively, stating "none that we are aware of at this time because we recalled the seventeen that were improperly signed." No specific statements were made during the broadcast about Fitzgerald or her certification status.
According to Fitzgerald, during the week following the broadcast, eight of her nine patients, none of whom testified at trial, left her private practice, and the ninth was referred to another counselor. Fitzgerald continued to work at UMC until November of 1993, when her one-year appointment ended. She and her husband then moved to Texas, where Fitzgerald did not practice as a substance abuse counselor. When Fitzgerald's certification came up for renewal in 1994, she mailed her certification packet to the Board. The then vice-chairman of the certification committee notified Fitzgerald by letter that her application was insufficient because Fitzgerald had only 44.5 hours of continuing education, whereas the Board rules required 48 hours. It was later revealed that that letter was drafted by Tucker, who was no longer on the Board at the time, but was serving as a consultant to the Board. Fitzgerald eventually became recertified, returned to Louisiana, and resumed her practice as a substance abuse counselor.
In June of 1993, Fitzgerald filed this lawsuit against Tucker and his wife, Karen, for defamation, tortious interference with contract, intentional infliction of emotional distress, and violations of 42 U.S.C. § 1983. After a four day trial, a twelve person jury unanimously found Tucker liable to Fitzgerald, and awarded her $50,000.00 for defamation and $56,600.00 plus legal interest for contractual interference.[2] Tucker appealed the district court judgment. In briefs to the court of appeal, Fitzgerald listed the following eighteen "retaliatory acts," quoted below, allegedly committed by Tucker which Fitzgerald contends supports the jury's verdict:
1. removed board minutes from the [Board's] offices and reported to authorities that no signed minutes were in the offices;
2. initiated a telephone call to the Lafayette Parish District Attorney's office advising criminal wrongdoing may have taken place because the board minutes were not signed;
3. initiated a meeting with the Governor's Counsel to discuss perceived wrongdoing at the [Board];
4. initiated a meeting with the Inspector General for the State of Louisiana to *712 discuss the perceived wrongdoing at the [Board];
5. initiated a meeting or discussion with the Department of Health and Hospitals and Legislative auditor to discuss perceived wrongdoing at the [Board];
6. on November 10, 1992, initiated an investigation into the prior [Board] chairman's actions;
7. on November 13, 1992, writes to the former chairman of the [Board] and advises him he has copies of all minutes of board meetings;
8. on November 13, 1992, writes to Fitzgerald seeking the recall of her certificate evidencing her certification as a substance abuse counselor;
9. on December 2, 1992, writes to Fitzgerald's attorney and advises he wants the certificates so he can destroy same due to invalid signatures;
10. on January 27, 1993, writes to Fitzgerald and seeks the allegedly invalid certificates so he may destroy same and, accusing her of unprofessional conduct, threatens disciplinary action;
11. advised that he believed Fitzgerald was trying to interfere with the necessary duties of the reorganization of the [Board];
12. received Fitzgerald's allegedly defective certificate and allowed it to remain in full view at the [Board]'s offices;
13. as per Mrs. Karen Tucker there was an indication that Fitzgerald was the subject of a criminal investigation and that she would be indicted;
14. contacted Fitzgerald's supervisor at UMC and called into question Fitzgerald's credentials to supervise substance abuse counselors;
15. stated that Fitzgerald's unit at UMC had, "operated in violation of the law" and advised Fitzgerald's supervisor that "unlawful and illegal" operations had been undertaken in her unit;
16. went to Fitzgerald's overall supervisor at UMC and told her that Fitzgerald was not qualified to work at UMC;
17. engaged in a television interview shown over South Louisiana and held up Ann Lang Fitzgerald's allegedly invalid certificate that he assured her would be destroyed and agreed that persons may be masquerading as substance abuse counselors and holding bogus certification; and
18. after he left the [Board], he received Fitzgerald's application for recertification as a substance abuse counselor and as a consultant for the [Board] drafted a letter for signature by the then Chairman of the [Board] committee for certification questioning Fitzgerald's applications and denying same for deficiencies.
The court of appeal in a three-to-two decision affirmed the district court's judgment. After noting that Fitzgerald cited eighteen "retaliatory acts" in her appellate brief, the majority reasoned that, "[i]f proven, any one defamatory act would support the jury's award of damages to Fitzgerald." The majority then reasoned that "Tucker uttered numerous untrue statements about Fitzgerald to other individuals, regarding, among other things, her credentials." The majority further reasoned that Tucker defamed Fitzgerald during the television interview.[3] Then, focusing on the interview, the majority held that Fitzgerald proved all of the elements of a defamation claim. The majority reasoned that Fitzgerald was a private individual and should only have been required to prove either defamation per se or negligence. Thus, the majority declared the jury instructions, which required the jury to find that Tucker acted with actual malice, to be harmless error, i.e., imposing the actual malice standard was a legal mistake which burdened Fitzgerald, but did not *713 cause the jury to find in her favor. The majority then overruled the portion of the judgment awarding Fitzgerald $56,600.00 for contractual interference, finding that Fitzgerald's departure from her job at UMC was voluntary. The majority, however, modified Fitzgerald's defamation award to reflect an additional $56,600.00 in damages, citing as authority its power under La.C.Civ.Pro. article 2164 to "render any judgment which is just, legal, and proper upon the record on appeal."
The two dissenting judges disagreed, finding that Fitzgerald was not a private individual, and that the speech did not involve a matter of private concern. The dissenters reasoned that the trial court properly required the jurors to find actual malice because Fitzgerald was a public official. The dissenters further reasoned that even if Fitzgerald were properly construed to be simply a private individual, the speech involved a matter of public concern, which still requires that Fitzgerald prove actual malice. The dissenters then found that the jury erred in concluding that Fitzgerald satisfied her burden of proving actual malice. The dissenters focused on the television interview, as well as the thirteenth "retaliatory act," that Tucker told his wife that Fitzgerald would be indicted. Regarding the latter allegation, the dissenters noted that both Tucker and his wife denied that such a statement was made, and that the exact nature of Tucker's comment to his wife is difficult to determine. Regarding the television interview, the dissenters reasoned that Tucker made no clear reference to Fitzgerald as the holder of a bogus certificate, and that no false statement was ever made about the recall of her certificate. The dissenters also took issue with the majority's modification of, or increase in, Fitzgerald's defamation award.

Pleading Defamation
Our code of civil procedure sets forth a system of fact pleading. Cox. v. W.M. Heroman & Co., 298 So.2d 848, 855 (La.1974). Article 854 provides that "all allegations of fact of the petition ... shall be set forth in numbered paragraphs." The Code further provides that a petition must contain "a short, clear, and concise statement of ... the material facts of, the transaction or occurrence that is the subject matter of the litigation...." La. C.Civ.Pro. art. 891(A). To plead "material facts," the petitioner must allege more than mixed questions of law and fact, such as that the defendant breached the contract or acted unreasonably. Frank L. Maraist & Harry T. Lemmon, 1 Louisiana Civil Law Treatise Civil Procedure § 6.3, at 102 (1999). Rather, "[t]he Code requires the pleader to state what act or omission he or she will establish at trial." Id. (footnote omitted).
Fact pleading advances several goals of the petition, such as satisfying the defendant's constitutional guarantee of due process by providing the defendant with fair notice, limiting the issues before the court, and notifying the defendant of the facts upon which the plaintiff bases his claims. See Id. at 101. Thus, to plead material facts, a petitioner alleging a cause of action for defamation must set forth in the petition with reasonable specificity the defamatory statements allegedly published by the defendant. See Acme Stores v. Better Bus. Bureau of Baton Rouge, 225 La. 824, 74 So.2d 43, 44 (1954) (It is not necessary for a plaintiff to state verbatim the words on which he bases his cause of action, but he must allege a state of facts or condition of things which would show fault under article 2315.); Juneau v. Avoyelles Par. Police Jury, 482 So.2d 1022, 1027 (La.App. 3d Cir.1986) (Plaintiff in a defamation suit must name the individual offenders and allege separate acts of defamation as to each, including specific defamatory statements.); Robert D. Sack & Sandra S. Baron, Libel, Slander & Related Problems § 4.3.2 (2d ed. 1994 & Supp. 1998) (citing numerous cases and recognizing that "the defendant must be informed of what he or she is alleged to have said in order to be able to prepare a defense"); *714 Rodney A. Smolla, Law of Defamation § 12.05[1] (1998) ("The tradition in defamation actions is to require that the specific defamatory language be pleaded; this is a widely followed practice even when not strictly required under local pleading rules.").
As quoted above, Fitzgerald in her appellate briefs to the court of appeal and to this Court alleges eighteen "retaliatory acts" committed by Tucker which support the jury's verdict. These acts are listed in the "Statement of the Case" sections of Fitzgerald's briefs. In the argument sections of her briefs, Fitzgerald refers to many of these acts as defamatory. Specifically, Fitzgerald's brief states that "the `Statement of the Case' section reveals instances where Tucker defamed Fitzgerald." Of the eighteen acts listed, Fitzgerald's brief then highlights ten of "the most glaring examples of defamation."[4]
During oral argument before this Court, Fitzgerald's attorney, in response to the Court's questions, attempted to clarify exactly which of Tucker's statements were allegedly defamatory. Fitzgerald's attorney avowed that the eighteen acts demonstrated Tucker's fault, and that only a few of them were defamatory. Specifically, Fitzgerald's attorney represented during oral argument that Tucker defamed Fitzgerald on three occasions. First, Tucker defamed Fitzgerald during the television interview; second, Tucker defamed Fitzgerald by telling Tucker's wife that Fitzgerald may be indicted; and, third, Tucker defamed Fitzgerald by communicating to Fitzgerald's supervisor at UMC that Fitzgerald was working in violation of law and that she was "not credentialed as a substance abuse counselor."
A careful review of Fitzgerald's petition for damages, however, reveals that Fitzgerald only alleged that she was defamed twice by Tucker. The first instance, according to Fitzgerald's petition, occurred before, during, or after a meeting of the Acadiana Council on Addictions. Specifically, Fitzgerald's petition reads as follows:
10.
At some point before, during or after the meeting on March 9, 1993, of the ACADIANA COUNCIL ON ADDITIONS, [Thomas C. and Karen Tucker] both made statements to people at the meeting that petitioner was and is responsible for causing turmoil between the UMC Counselor Trainees and the [Board].[5]
The second instance of defamation allegedly occurred when Tucker held up Fitzgerald's *715 certificate and later responded to the interviewer's questions about extant unnumbered and improperly signed certificates. Specifically, Fitzgerald's petition reads as follows:
13.
During the June 11, 1993, interview, at approximately 6:00 p.m., defendant Thomas C. Tucker held up petitioner's recalled certificate....
14.
Defendant Thomas C. Tucker in the June 11, 1993, interview indicated and affirmed that petitioner's certificate was "bogus" and that petitioner is "... out there masquerading ..." as a substance abuse counselor.
In her petition, Fitzgerald never alleges that Tucker published any other defamatory statements which injured Fitzgerald.[6]
Moreover, Fitzgerald did not expand the petition by adducing at trial without objection evidence of other allegedly defamatory statements by Tucker. The general rule is that pleadings may be enlarged by evidence adduced without objection when such evidence is not pertinent to any other issue raised by the pleadings and, hence, would have been excluded if objected to timely. La.C.Civ.Pro. art. 1154; Roberson v. Provident House, 576 So.2d 992, 994-95 (La.1991); Webster v. Rushing, 316 So.2d 111, 114-15 & n. 10 (La.1975); Cooper v. Borden, 30,292 (La. App.2d Cir.2/25/98), 709 So.2d 878, 881; Diesi Leasing, Inc. v. Morrow, 542 So.2d 838, 841 (La.App. 3d Cir.), writ denied, 548 So.2d 329 (La.1989). In the instant case, the record reflects, and Fitzgerald's attorney admits in oral argument, that evidence of the eighteen "retaliatory acts" is relevant to the issue of whether defendant acted with actual malice. We also believe that evidence of the other statements was relevant to whether Tucker intentionally interfered with Fitzgerald's employment contract with UMC.
Accordingly, this Court will only review Fitzgerald's allegations that Tucker defamed her at the March 9, 1993 Acadiana Council on Addictions meeting and during the television interview.

Proving Defamation
A cause of action for defamation arises out of a violation of Civil Code article 2315. Vicknair v. Daily States Pub. Co., 153 La. 677, 96 So. 529 (1923); Ferdinand F. Stone, 12 Louisiana Civil Law Treatise Tort Doctrine § 176(c), at 227 (1977). Defamation involves the invasion of a person's interest in his or her reputation and good name. Sassone v. Elder, 92-1856 (La.10/18/93), 626 So.2d 345, 350 (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 111 (5th ed.1984)). In order to prevail in a defamation action, a plaintiff must necessarily prove four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Trentecosta v. Beck, 96-2388 (La.10/21/97), 703 So.2d 552, 559 (citing Restatement (Second) of Torts § 558 (1977)); see Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196, 198 (La.1980) (considering falsity as a fifth and separate element). In other words, a plaintiff must prove "`that the defendant, *716 with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.'" Trentecosta, 703 So.2d at 559 (quoting Sassone, 626 So.2d at 350).
We first turn to the statement allegedly uttered by Tucker at the Acadiana Council on Addictions meeting that Fitzgerald "was and is responsible for causing turmoil between the UMC Counselor Trainees and the [Board]." An exhaustive review of the record (including the 464 page trial transcript and the parties' pre-trial memoranda and stipulations), the parties' appellate briefs, and the oral arguments before this Court reveals not one iota of discussion about this meeting, let alone statements made at the meeting by Tucker that Fitzgerald caused turmoil between UMC counselor trainees and the Board. Accordingly, we find that Fitzgerald failed to meet her burden of proving the second element of a defamation claim, that Tucker published this statement.
We next consider the second instance of alleged defamation, Tucker's statements during the interview with Huebner. As noted above, for a statement to be actionable, it must be false, defamatory, and concern another. Generally, a communication is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise exposes a person to contempt or ridicule. Trentecosta, 703 So.2d at 559 (citing Restatement (Second) of Torts § 559 cmt.(e) (1977)); Freeman v. Cooper, 414 So.2d 355 (La.1982). Thus, a communication which contains an element of personal disgrace, dishonesty, or disrepute undoubtedly satisfies the definition of defamatory. Trentecosta, 703 So.2d at 559; Bussie v. Lowenthal, 535 So.2d 378 (La.1988). Nonetheless, not all defamatory statements are actionable. Rather, many statements are protected by the First Amendment's guarantee of freedom of speech. For example, "`a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.'" Romero v. Thomson, 94-1105 (La.1/17/95), 648 So.2d 866, 870 (quoting Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). Also, "[s]peech on matters of public concern enjoys enhanced constitutional protection." Romero, 648 So.2d at 869.
Ultimately, the court must decide whether a communication is capable of a particular meaning and whether that meaning is defamatory.[7]Sassone, 626 So.2d at 353 & n. 9; Bussie, 535 So.2d at 382.
[A]s a general rule, a Louisiana appellate court should not disturb the reasonable findings and inferences of fact of a trial judge or jury, even though the appellate court may feel that its own evaluations and inferences are as reasonable. But when interpretation of a communication in light of the constitutional requirements is involved, our scope of review is to examine in depth the "statements in issue" and the "circumstances under which they were made," and to "re-examine the evidentiary basis" of the lower court decision in the light of the Constitution.
Mashburn v. Collin, 355 So.2d 879, 886-87 (La.1977).
In Mashburn v. Collin, this Court declared "that the First Amendment freedoms ... afford, at the very least, a defense against defamation actions for expressions of opinion...." Id. at 885. We expounded on this rule in Bussie v. Lowenthal, stating that:
a pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or imply the existence of underlying facts, usually will not be actionable in *717 defamation. That is because falsity is an indispensable element of any defamation claim, and a purely subjective statement can be neither true nor false.
Id. at 381 (citation omitted). However, in Bussie we also noted that statements of opinion usually refer to express or implied statements of fact. Id. Of course, if a statement of opinion is accompanied by an express statement of fact, that express statement of fact may be actionable if it is defamatory, false, and concerns another. Moreover, if a statement of opinion implies that certain facts exist, then such a statement, even though couched in terms of an opinion, could certainly give rise to a defamation action if the implied factual assertions are defamatory and false. Id. (citing Freeman, 414 So.2d at 355). "[E]ven if an opinion gives rise to false factual inferences, the defendant will be liable only if the statement was made with `knowing or reckless falsity.'" Id. & n. 6 (footnote omitted) (quoting Mashburn, 355 So.2d at 885). Moreover, "the factual inference created by the statement [of opinion] must be ascertainable by a reasonable person with some degree of certainty." Id. at 378. "Otherwise, juries would be asked to engage in guessing-games about possible uncomplimentary inferences that can be drawn from statements of opinion, and the First Amendment protections afforded in this area would become worthless." Id. (footnote omitted); see Restatement (Second) of Torts § 566 cmt.(c)(4). In sum, an expression of opinion is actionable only if it implies the existence of underlying facts ascertainable by a reasonable person with some degree of certainty, and the implied factual assertions are false, defamatory, made with actual malice, and concern another.
In addition to false, defamatory statements of fact, and statements of opinion made with actual malice which imply false, defamatory facts, yet another type of statement is actionable under Louisiana's law of defamation. A plaintiff may recover for defamation by innuendo or implication, which occurs when one publishes truthful statements of fact, and those truthful facts carry a false, defamatory implication about another. Schaefer v. Lynch, 406 So.2d 185, 188 (La.1981); see Sassone, 626 So.2d at 353-54; Sack & Baron, supra, § 3.6; Smolla, supra, § 4.05[1]. In other words, defamatory meaning can be insinuated from an otherwise true communication. Schaefer, 406 So.2d at 188. The rationale behind this rule is that, when truthful statements carry a defamatory innuendo, the factual implication should also be true to justify the implication. Id. Nonetheless, the publication of true statements is generally encouraged even if published "`for no good reason or for the worst possible motives....'" Id. (quoting Prosser, Law of Torts, 4th ed., West, p. 197). Moreover, truthful facts which carry a defamatory implication can only be actionable if the statements regard a private individual and private affairs. Schaefer, 406 So.2d at 188. "Where public officers and public affairs are concerned, there can be no libel by innuendo."[8]Id.
The determination of whether a statement is an assertion of fact or a mere expression of opinion should be made according to the facts of each particular case. Bussie, 535 So.2d at 381. "In Mashburn, *718 we noted that `the crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact.'" Id. (quoting Mashburn, 355 So.2d at 885).
The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker did not intend to assert another objective fact but only his personal comment on the facts which he had stated. An expression of opinion occurs when the maker of the comment states the facts on which his opinion of the plaintiff is based and then expresses a comment as to the plaintiff's conduct, qualifications or character or when both parties to the communication know the facts or assume their existence and the comment is clearly based on the known or assumed facts in order to justify the comment.
Mashburn, 355 So.2d at 885. The question of whether a statement is one of fact or opinion depends upon the circumstances in which the statement was made, and the reasonable inferences which may be drawn from a statement of opinion will vary depending upon the circumstances of the case.
We turn now to determining whether Tucker published actionable statements during the interview with Huebner. So that we can better analyze the nature of the statements in the context of the interview, we transcribe below the relevant portions of the interview. Tucker's and Huebner's corresponding actions are bracketed and italicized, and the statements alleged to be defamatory are printed in bold type. Before Huebner asks Tucker any questions, a voice quotes several deficiencies noted in the Legislative Auditor's report, as each quote is displayed across the television screen. The transcription begins with the last quote read and displayed.
Voiceover: "And failed to issue certificates to substance abuse counselors in consecutive order ..." [Quote is displayed on the screen. Neither Tucker nor Huebner is shown].[9]
Huebner: So there is no way to account for how many have been issued, which is of considerable concern to Tucker and others. [While Tucker is holding Fitzgerald's improperly signed certificate, the camera zooms in, displaying the certificate, including her name.]

Tucker: We would encourage any person who has a question about a certificate to call the Board. We can verify who has authentic certificates today. [Before Tucker responds, he lowers his arms, thereby removing Fitzgerald's name from the camera's view. It is apparent that Tucker is still holding the certificate, though.]

Huebner: So there could be people out there masquerading as substance abuse counselors? [Huebner gestures toward Fitzgerald's certificate, which is still in Tucker's hands. Fitzgerald's name is not visible.]

Tucker: That could be happening.
Huebner: Do you have any idea how many bogus ones are out there? [Huebner gestures toward Fitzgerald's certificate, which is still in Tucker's hands. Fitzgerald's name is not visible.]

Tucker: No sir. None that we are aware of at this time because we recalled the seventeen that were improperly signed.
Huebner: The seventeen that you know of?
Tucker: The seventeen that we know of.
*719 We find that the first statement "That could be happening"was a statement of opinion. Given the circumstances surrounding the statement, we believe ordinary persons hearing this statement would be likely to understand it as an expression of Tucker's opinion. He was responding to a question about the mere possibility of people "masquerading" as substance abuse counselors, due to the Board's inability to account for certificates. Moreover, the term "masquerading" is subjective in nature, and Tucker never stated that anybody, let alone Fitzgerald, was in fact practicing as a substance abuse counselor without a valid certificate.
In order for an expression of opinion, which is highly protected by the First Amendment, to be actionable, it must imply the existence of underlying facts ascertainable by a reasonable person with some degree of certainty, and the implied factual assertion must be false, defamatory, made with actual malice, and concern another. In this case, Tucker never spoke Fitzgerald's name. Also, Tucker did not display Fitzgerald's name when he responded to Huebner's question. Although it is within the realm of possibility that someone may have believed that Fitzgerald, herself, was masquerading as a substance abuse counselor with a bogus certificate in violation of Board rules, it is not an inference which a reasonable person would readily ascertain with some degree of certainty. In fact, a reasonable person might conclude just the opposite, that Fitzgerald is not masquerading as a counselor with a bogus certificate, because Tucker, the chairman of the Board, was holding that certificate during the interview. Moreover, one of Tucker's responses actually affirms that nobody has an improper certificate anymore because each has been collected. How then could Fitzgerald be masquerading with a bogus certificate? It is telling that at trial not one individual testified that, as a result of viewing the newscast, he believed Fitzgerald was uncertified or counseling in violation of Board rules.[10]
Furthermore, a reasonable person might readily ascertain with some degree of certainty from Tucker's statements that there is a possibility that somebody, other than Fitzgerald (whose certificate was in the hands of Tucker) may have an unnumbered certificate. This is substantially true. Moreover, another inferencethat at one point Fitzgerald in fact had an improperly signed, unnumbered certificate is substantially true. See Romero, 648 So.2d at 871; Otero v. Ewing, 165 La. 398, 115 So. 633 (1927). Yet another possible factual inference exists, viz., that Fitzgerald was somehow involved in the improper execution of the certificates. Again, such an inference is substantially true, as Fitzgerald was charged with the responsibility of having the certificates duly executed, but instead brought them to a non-Board member for his signature. Furthermore, a viewer of the newscast could have readily ascertained whether Fitzgerald's certificate was currently valid by calling the Board, as Tucker encouraged during the interview. Accordingly, we find that Tucker's statement that "[t]hat could be happening" is not actionable as matter of law.
We next turn to the second allegedly defamatory statement published by Tucker"No sir. None that we are aware of at this time because we recalled the seventeen that were improperly signed." Given the circumstances surrounding this statement, we believe ordinary persons hearing this statement would likely understand it as an expression of fact. The statement is not capable of subjective interpretation, but rather states the precise number of improperly signed certificates that had been recalled at that time. Moreover, Tucker is speaking in his capacity as chairman of the Board. By using the pronoun "we" in the context of this specific *720 interview, it is quite clear that Tucker intends the statement not to be construed as his personal opinion, but rather as a statement of fact by the Board.
Significantly, there is nothing provably false about Tucker's statement. Tucker tactfully avoids incorporating Huebner's reference to the certificates as "bogus," instead referring to them as improperly signed. It is substantially true that the certificates were improperly signed certificates, and that seventeen had been recalled by the Board, at the Inspector General's direction. See Romero, 648 So.2d at 871; Otero, 115 So. at 633. Accordingly, we find that Tucker's response concerning improperly signed certificates is not an actionable, false statement of fact.
We now consider whether Tucker's statements constituted defamation by innuendo, i.e., did Tucker publish truthful statements of fact which carry a false, defamatory implication. Essentially, we must determine whether Tucker implied false, defamatory innuendo about Fitzgerald by displaying Fitzgerald's improperly signed certificate[11] and later truthfully replying to Huebner's question. We have earlier noted that a plaintiff may claim defamation by innuendo only if the statements regard a private individual and private affairs. Schaefer, 406 So.2d at 188 (emphasis added). "Where public officers and public affairs are concerned, there can be no libel by innuendo." Id. Unquestionably, the issuance of unnumbered and improperly executed Board certificates is a matter of public concern. Not only is their existence disconcerting to the public, but so is the Board mismanagement resulting in their issuance. Clearly, the Legislative Auditor found the matter troubling, Huebner thought the matter was newsworthy, and various certified substance abuse counselors testified at trial that they thought the matter was a matter of public concern. Accordingly, we find that Tucker's statement of fact did not constitute defamation by innuendo.
For the foregoing reasons, we find that Tucker's statements during the interview are not actionable, defamatory statements. Because the record does not establish that Tucker's alleged statement during the Acadiana Council on Addictions meeting ever took place, and because Fitzgerald failed to allege in her petition that Tucker published any other actionable statements, we reverse the portion of the court of appeal's judgment affirming and modifying upward the award of damages for defamation, and hereby render judgment in favor of Tucker.

DECREE
JUDGMENT OF COURT OF APPEAL AWARDING PLAINTIFF DAMAGES IS REVERSED; JUDGMENT RENDERED IN FAVOR OF DEFENDANT THOMAS C. TUCKER; SUIT DISMISSED WITH PREJUDICE.
NOTES
[*] Marcus, J., not on panel. See Rule IV, Part 2, § 3.
[1] Among other deficiencies, Kyle reported that the Board did not maintain administrative and financial records, a violation of LSA-RS 44:36(A); that the Board's minutes lacked the signature of the chairman or executive director of the Board in violation of L.A.C. Title 46, Part LXXX, Ch. 5, § 503 F; that all certificates could not be accounted for because they were not consecutively numbered or pre-numbered; that the Board did not file the required Internal Revenue Service and other payroll tax forms; that the Board's personnel files for its three employees did not contain the hourly rate of pay, employment contracts, W-4s, L-4s, or any payroll forms authorizing payroll deductions; that the Board failed to adopt, amend, or report an annual budget for either year in violation of LSA-R.S. 39:1331 et seq.; that the Board bought a copy machine and entered into a lease-purchase agreement for office equipment in violation of state purchasing regulations; that the Board had pre-signed checks in the checkbook; that the Board's receipts only reflected deposits; that the Board had 13 pre-approved, blank time sheets, that the Board did not maintain invoices or time and attendance sheets to support payments; and that of 40 payments amounting to $11,020.00, 31 payments amounting to $9,472.00 were not properly supported.
[2] Tucker's wife was dismissed from the suit, the emotional distress claim was abandoned, and, on Tucker's motion for directed verdict, the civil rights claim was dismissed.
[3] The majority opinion did not identify specifically any particular statement of Tucker's as being defamatory.
[4] According to Fitzgerald's brief, the most glaring examples of defamation occurred when Tucker (1) called Fitzgerald's supervisor and indicated that Fitzgerald did not have adequate credentials as a substance abuse counselor; (2) advised Fitzgerald's supervisor that Fitzgerald was not qualified to work at UMC; (3) initiated a telephone call to the Lafayette Parish District Attorney's office advising them that criminal wrongdoing may have taken place because the board minutes, which Fitzgerald allegedly supervised, were not signed; (4-7) initiated meetings with the Governor's special counsel; State of Louisiana Inspector General; Legislative auditor; and, State of Louisiana Department of Health and Hospitals, all in an attempt to investigate the [Board's] office practices in which Fitzgerald performed day-to-day secretarial duties for a brief period of time; (8) further engaged in a television interview where he held up Fitzgerald's certificate and agreed there may be people with bogus certificates masquerading as substance abuse counselors, implying Fitzgerald had a bogus certificate and was masquerading as a substance abuse counselor; (9) indicated to various individuals, including Fitzgerald's husband, that during Fitzgerald's tenure as Administrative Director of the Board she was engaged in "cover ups"; (10) communicated to his wife, Karen, that Fitzgerald may be indicted. This last instance, according to Fitzgerald, "was the most clandestine, and perhaps the most damaging defamatory action."
[5] We find it unnecessary to determine whether the petition alleges with reasonable specificity that Tucker defamed Fitzgerald at the meeting of the Acadiana Council on Addictions, because we find, infra, that Fitzgerald did not present at trial any evidence whatsoever that Tucker ever uttered such a statement.
[6] In her petition, Fitzgerald never alleges that Tucker defamed Fitzgerald by telling Karen Tucker that Fitzgerald may be indicted. Rather, Fitzgerald alleges that "[d]efendant KAREN TUCKER told petitioner's supervisor that petitioner was going to be subject to an indictment for criminal conduct...," and that "KAREN TUCKER made these statements in a smug manner, knowingly, and with such reckless disregard for the truth that her statements were malicious and defamatory towards [Fitzgerald]." Karen Tucker has been dismissed from this suit. Moreover, Fitzgerald's petition does not allege that Tucker defamed Fitzgerald by communicating to Fitzgerald's supervisor at UMC that Fitzgerald was "working in violation of law" and that she was "not credentialed as a substance abuse counselor."
[7] The jury must decide whether a communication capable of a defamatory meaning was so understood by the recipient. Sassone, 626 So.2d at 352 n. 9.
[8] In Sassone, 626 So.2d at 354, the Court pretermitted the specific question of whether a private plaintiff may bring an action for defamation by innuendo against a media defendant. The Court found that, "when the court looks not at what was said, but at what impression was created, a media publication can give rise to an infinite number of impressions." Id. The Court then noted that, assuming a private plaintiff could bring an action for defamation by innuendo against a media defendant, adequate protection of freedom of the press at least requires that the a private plaintiff prove that the alleged implication is the principal inference a reasonable reader or viewer will draw from the publication as having been intended by the publisher. The Court then found that the principal inference of the statement at issue was not defamatory. Id.
[9] We are mindful that the twenty-minute video tape of the interview, which was not introduced into evidence, was substantially edited down to a two-minute newscast. Tucker had no control over the editing process, and was unaware of exactly which camera angles and views accompanied his statements.
[10] Fitzgerald testified that eight out of nine of her private counseling patients left her service after the newscast. However, none of them testified as to why they left her service.
[11] "[P]hotographs and similar visual communications rarely themselves make an express assertion beyond the fact that what is portrayed is real. Thus, defamation by picture is usually established through implication, given the context in which the photograph appears." Sack & Baron, supra, § 2.4.9. The depiction of Fitzgerald's certificate contained no distortions rendering it a falsehood, and the certificate displayed was in fact Fitzgerald's improperly executed certificate.