833 So.2d 486 (2002)
Angeline M. SINGLETON, Wife of/and Glen A. Singleton, Individually and on Behalf of Their Minor Children, Javon A. Singleton, Mark A. Singleton, Ravon A. Singleton, Garen A. Singleton, and Precious J. Singleton
v.
ST. CHARLES PARISH, Morris Zeringue and Rusty Rebowe.
No. 02-CA-590.
Court of Appeal of Louisiana, Fifth Circuit.
November 26, 2002.
*489 Jan P. Jumonville, Metairie, Counsel for Plaintiffs-Appellants, Angeline M. Singleton, wife of/and Glen A. Singleton, et al.
Alan A. Zaunbrecher, Metairie, Counsel for Defendants-Appellees, St. Charles Parish, Morris Zeringue, and Rusty Rebowe.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
CHEHARDY, J.
Plaintiff, Glen Singleton, appeals the dismissal of his suit for slander, defamation, and intentional infliction of emotion distress against St. Charles Parish, Rusty Rebowe, and Morris Zeringue.[1] We affirm.
Singleton was employed by the St. Charles Parish Department of Recreation as a maintenance worker from 1993 to July 13, 1999.[2] Morris Zeringue was a temporary foreman who was Singleton's supervisor from time to time when Singleton's regular foreman was absent. Rusty Rebowe was the director of the department.
Singleton filed suit against the Parish, Zeringue and Rebowe in December 1998, alleging that Zeringue made intentionally false statements about him to Rebowe claiming Singleton used foul and abusive language toward him, placed false information in Singleton's personnel file to that effect, and maintained the truth of his false statements following Singleton's grievance hearing, resulting in the false allegations being maintained in his personnel record. Singleton alleged that Rebowe failed to investigate the veracity of Zeringue's allegations, falsely told others that Singleton would be fired, and acted in concert with Zeringue to harass Singleton and intentionally inflict emotional distress on him.
Singleton alleged numerous additional incidents involving Zeringue and/or Rebowe, in which both allegedly made false statements about him to others, retaliated against him for complaining, applied a higher standard of rules and regulations to him than to other employees, and generally created a hostile work environment.
He alleged the Parish of St. Charles is vicariously liable for the acts of its employees, Zeringue and Rebowe.
Singleton asserted that as a result of the defendants' behavior he suffered disabling injuries to his mind, including severe major depression, daily suicidal thoughts, disturbed appetite and sleep, nightmares, crying spells, severe anhedonia and emotional outburst, stress, and acute emotional distress and turmoil. He sought damages for pain and suffering, disability, loss of enjoyment of life, medical expenses, and loss of income.
The matter was tried by the district judge on August 15, 17, and 27, 2001.[3] Plaintiff presented numerous witnesses. At the close of plaintiff's case, the defense made a motion for involuntary dismissal, which was denied. The defense then call plaintiff under cross-examination, but presented *490 no further witnesses. After holding the matter under advisement for some time, the court issued a judgment in favor of the defendants, dismissing plaintiffs' demands.
In written Reasons for Judgment, the court found that there was "a definite personality conflict" between Singleton and Zeringue and that Zeringue treated Singleton differently than other employees. The court concluded, however, "even accepting all Singleton's testimony as true," that the conduct of which Singleton complained did not rise to the level of egregious conduct necessary to support a claim for intentional infliction of emotional distress. The court did not find the defendants' behavior "extreme or outrageous" or that it would "result in distress that a reasonable person could not endure." On that basis, the court denied the claim for intentional infliction of emotional distress.
As for the charges of defamation, the court found the remarks allegedly made by Zeringue were statements of opinion that did not give rise to a cause of action for defamation. Thus, the court also denied the claim for defamation.
On appeal, Singleton asserts (1) the trial court erred in finding that the conduct of Zeringue and Rebowe did not rise to the level of egregious conduct necessary to support a claim for intentional infliction of emotional distress and (2) the court erred in finding that the statements of Zeringue and Rebowe were opinions that did not give rise to a cause of action for defamation.

Facts
Plaintiff testified that he first had a problem in 1993, when he was wrongly accused of stealing some plywood from a lumber yard. The lumber yard owner thought plaintiff was involved a making "deals" using parish property. The lumber yard owner later admitted he was mistaken and the charges were dropped. Nevertheless, plaintiff was suspended from his job for three days without pay, for misuse of parish property (using his work truck to haul the plywood, which was his personal property) and misuse of parish time (running errands to the lumber yard while on duty at his job). Plaintiff said he had permission from his permanent supervisor, Don Muller, to run the errand on his break and to use the Parish truck, but the suspension was upheld.
In 1995 there was an incident in which plaintiff complained to his councilman about the failure of the Public Works Department to repair potholes on his street. While plaintiff was on duty one day he drove his parish vehicle to the Public Works yard. He was confronted by Rusty Eusea, supervisor of the Public Works Department, who shook his fist at him aggressively and admonished him for "going over his head" about the road repair. Plaintiff jumped back and fell against his truck. He was off work on worker's compensation for three months after that incident. He complained about Eusea's behavior to Rebowe, but Rebowe indicated he did not believe Eusea would behave that way and took no action.
Plaintiff testified that after Zeringue was made temporary foreman in 1995, he frequently criticized plaintiff's work, talked down to him, ridiculed him, smirked at him, watched him like a hawk, and lied about plaintiff's reporting in between job assignments. Plaintiff said his fellow workers told him Zeringue belittled him. Plaintiff felt that no matter to whom he complained, nobody listened, including Rebowe.
Several of plaintiff's coworkers testified they heard Zeringue say that plaintiff was lazy, didn't want to work, and worked slow. Several, however, indicated that Zeringue *491 behaved in similar ways to other workers. At least one coworker admitted hearing Zeringue use profanity in connection with plaintiff, with remarks such as that Glen Singleton didn't do a "F-ing" thing and that he was a lazy "M-F."
Plaintiff and two coworkers testified to a meeting in which Rebowe announced that someone had put sugar into the gas tank of a compressor and admonished the workers. Plaintiff and his witnesses stated that Rebowe looked at plaintiff while stating the Department "would not take a downfall," which plaintiff and the witnesses construed as an implication that plaintiff was the perpetrator. However, plaintiff testified he had been with one of the other witnesses during the entire time and, thus, could not have committed the vandalism.
One witness testified to an incident in 1997 when Zeringue was reading a newspaper article about someone being arrested. Zeringue accused plaintiff of being "in jail" and a criminal, which was not true.
In 1996, plaintiff applied for the position of Grass Cutter. He said Zeringue told him that his brother, Steven Zeringue, was going to get that position. In fact the position was awarded to Steven Zeringue. Plaintiff felt he should have gotten the position because he had seniority and he was qualified to operate the equipment.
On several occasions plaintiff was written up for being tardy. He testified that Zeringue refused to accept his reasons for being late, although they were valid and despite the fact that Zeringue relaxed his standards for other employees who were tardy. Plaintiff said Zeringue also refused to fill in the "Reason for Being Tardy" section on the forms before plaintiff signed the slips.
Plaintiff also testified that he was falsely written up for using threatening language to Rebowe. The incident arose after a disagreement between Zeringue and plaintiff over a tardy slip issued to plaintiff. They went to Rebowe's office to settle it. After Rebowe talked to Zeringue, Rebowe issued an Employee Warning based on accusations by Zeringue that plaintiff had used foul and abusive language toward him. Plaintiff denied he had done so.
In February 1998, plaintiff used personal time to take one of his sons to the hospital for medical tests. He requested the time as a vacation day from Rebowe. Rebowe gave him permission and told him to tell Zeringue he was leaving. Plaintiff told Zeringue he was leaving, but would be coming back. According to plaintiff, Zeringue lied to Rebowe and denied that plaintiff had told him he was leaving. When plaintiff returned to the job later that day, Rebowe admonished him for failing to tell Zeringue. Rebowe placed a warning in plaintiff's personnel file.
Plaintiff filed an in-house grievance to remove the warning he had received for allegedly using foul and abusive language toward Zeringue. Despite the testimony of four witnesses on behalf of plaintiff at the grievance hearing, the personnel officer, Sandra Zimmer, recommended to the parish president that the warning remain in plaintiff's file. Her recommendation was approved. Although plaintiff filed a petition for appeal to the civil service board, no action was ever taken on his appeal and it was never set for hearing.
Plaintiff testified that Rebowe put negative letters about him in his personnel file complaining of his behavior, which he was not allowed to see, and of which he learned only through this litigation.
In May or June 1998, Zeringue falsely reported to Don Muller that plaintiff had failed to chalk a field (i.e., draw chalk lines on a baseball diamond), as he had been ordered to do. On another occasion when Zeringue was acting as foreman in Muller's *492 absence, he ordered plaintiff to widen the field between the baseball bases, although plaintiff told him that was not the way Muller wanted it done. When Muller returned he was annoyed and ordered the field redone. Muller commented to plaintiff that Rebowe let Zeringue do whatever he wanted.
In August 1998 plaintiff informed Zeringue he needed an emergency vacation day to take his son to the doctor. However, Zeringue failed to report his request to Rebowe's office.
On August 17, 1998, Zeringue ordered plaintiff to mow a baseball field while the grass was wet. Plaintiff told him that Muller always wanted the grass-cutting delayed until the dew had dried. Zeringue insisted he proceed mowing immediately, however. As a result, plaintiff was reprimanded later in the day by Rebowe for doing a poor job. Rebowe told him the field looked like "shit" and ordered him to remow it. Rebowe refused to listen to plaintiff's explanation, while Zeringue stood watching plaintiff with his arms folded and a smirk on his face. According to plaintiff, Rebowe also approached him in a threatening manner and ordered him to "do a good job."
As a result of the mowing incident, plaintiff forgot to place an official request for a vacation day with Rebowe to cover the time he had taken off. On August 21, 1998 he received his pay sheet, showing he had been docked pay for the day he took off. When he went to Rebowe's office to request the emergency vacation day, Rebowe refused. As plaintiff was leaving the office he told Rebowe, "Don't worry about it, God take care his people." Rebowe wrote him up, stating plaintiff had threatened him.
Plaintiff was very upset after that incident. That was the last day he worked. After spending a weekend brooding, losing his temper with his children, and being very depressed, he checked himself into River Oaks Hospital.
Acting on the advice of his psychiatrist, plaintiff did not return to his job with the Recreation Department after his hospitalization. He continued to attend ball games at Recreation Department facilities, however, and he related several incidents that occurred while he was off work in which he felt humiliated by Rebowe. On one occasion Rebowe sent a police officer to him on the field to make him move from where he was standing; another time Rebowe sent an officer to make plaintiff pay admission to a game in which plaintiff thought he had been allowed in free. Rebowe encountered plaintiff in public places several times, talking to other Recreation Department workers; each time Rebowe made a point of greeting and shaking hands with the other workers while ignoring plaintiff.
Plaintiff's wife and children testified to changes in his behavior and temperament at home. They stated he became withdrawn, moody, and isolated himself; he had temper displays that had not occurred before; he no longer participated in his children's sports activities; his sex life with his wife was affected.
After plaintiff resigned from the Recreation Department, he was hired by Monsanto for nearly twice the hourly wage he had earned working for the Parish.[4]
Intentional Infliction of Emotion Distress
Singleton contends that the conduct directed to him was not an isolated *493 instance, but was extreme and outrageous conduct by his temporary foreman and superior, who had the power and authority to affect his job. He argues their actions "reasonably can be characterized as a conspiracy" to have Singleton fired or cause him to resign. He points out that the defendants made false accusations, took employment action to destroy his record with the Parish, penalized him financially, ridiculed him, threatened him, applied a different standard to him, belittled him to his co-workers, treated him differently than other workers, and repeated these actions over the years until Singleton finally broke down mentally. He contends no reasonable person could be expected to endure this emotional distress without breaking down mentally.
Defendants-appellees, St. Charles, Zeringue and Rebowe, assert that Singleton has sought damages and/or worker's compensation numerous times for alleged physical and/or mental injuries, with several of the matters involving frivolous claims against his employers, made immediately after he had been suspended or terminated for various reasons.[5] Defendants argue this pattern continued in the present case, noting that Singleton was cited for tardiness on several occasions and for several instances of employment misconduct and, after prior suspension, he was again suspended without pay for threatening his boss, Rusty Rebowe, on August 21, 1998. Defendants assert Singleton failed to report any accident or injury, but instead presented himself several days later to River Oaks Hospital, without a doctor's referral, for treatment for self-diagnosed depression. He returned home after five days at River Oaks and, according to his wife, returned "pretty much to normal" within a month. He told his doctor he was working and earning money; he started several renovation and work projects, but he never returned to his job as a maintenance worker at the St. Charles Parish Recreation Department. Defendants assert that under the manifest error rule, plaintiff cannot establish that the trial court was clearly wrong in its factual determinations regarding his failure to establish his claim for intentional infliction of emotional distress.
The leading case on the standards for proving intentional infliction of emotional distress is White v. Monsanto, 585 So.2d 1205 (La.1991), which set out the following principles:
In order to recover for intentional infliction of emotional distress, a plaintiff must establish that the conduct of the defendant was extreme and outrageous, that the emotional distress suffered by the plaintiff was severe, and that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. 585 So.2d at 1209.
The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam."...

*494 The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.... Thus, many of the cases have involved circumstances arising in the workplace....A plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger....
On the other hand, conduct which may otherwise be extreme and outrageous, may be privileged under the circumstances. Liability does not attach where the actor has done no more than to insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional stress....Thus, disciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable. Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time....
The distress suffered must be such that no reasonable person could be expected to endure it. Liability arises only where the mental suffering or anguish is extreme....
The defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered. But the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough....It follows that unless the actor has knowledge of the other's particular susceptibility to emotional distress, the actor's conduct should be judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities.
Liability can arise only where the actor desires to inflict severe emotional distress or where he knows that such distress is certain or substantially certain to result from his conduct....The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like. [Citations omitted.]
585 So.2d at 1209-1210.
In White v. Monsanto, the court found that the plaintiff failed to establish her right to recover for an intentional tort. Plaintiff was subjected to a one-minute outburst of profanity directed at three employees by a supervisor in the course of dressing them down for not working as he thought they should. The court held that behavior was not sufficient "extreme and outrageous conduct" as to constitute intentional infliction of emotional distress:
The vile language used was not so extreme or outrageous as to go beyond all possible bounds of decency and to be regarded as utterly intolerable in a civilized community. Such conduct, although crude, rough and uncalled for, was not tortious....The brief, isolated instance of improper behavior by the supervisor who lost his temper was the kind of unpleasant experience persons must expect to endure from time to time. The conduct was not more than a person of ordinary sensibilities can be expected to endure. The tirade was directed to all three employees and not just to plaintiff specifically. Although the evidence certainly supports a finding that plaintiff was a decent person and a diligent employee who would not condone *495 the use of vulgar language and who would be upset at being unjustifiably called down at her place of work, there was no evidence that she was particularly susceptible to emotional distress, or that McDermott had knowledge of any such susceptibility. It was obviously his intention to cause some degree of distress on the part of the employees, but there is no indication that his spontaneous, brief, intemperate outburst was intended to cause emotional distress of a severe nature.
585 So.2d at 1210-1211.
White v. Monsanto established a high threshold for evidence of intentional infliction of emotional distress. Nicholas v. Allstate Ins. Co., 99-2522, p. 1 (La.8/31/00), 765 So.2d 1017, 1019.[6] In Nicholas, the plaintiff was an insurance agent whose territorial sales manager, Monie, told another employee he wanted Nicholas' "scalp on [his] tepee pole" and to expand his review of low-producing agents so that Nicholas would become the lowest peer group performer. 99-2522 at pp. 16-17, 765 So.2d at 1028. The court found there was no doubt that Monie had singled out Nicholas from his peers for corrective review; yet, although the tactic seemed "arbitrary and without compassion," the court could not say that the conduct rose to the "high threshold of extreme and outrageous conduct." 99-2522, p. 17-18, 765 So.2d at 1028. Even the fact that Monie used the term "scum" to refer to the lower-producing agents, "though demeaning and inappropriate," was insufficient, because Nicholas did not show the language was directed at him individually or that he heard it when Monie uttered the term.
The court concluded, "Although Monie's technique may be subject to criticism because it was demeaning, inappropriate, and not fully justified, we cannot say that it was outrageous conduct or conduct which went beyond the bounds of decency." Id. The court commented further, "Again, although we might question Monie's motives, we recognize that disciplinary action and conflict in a pressure-packed workplace environment, though calculated to cause some degree of mental anguish, are not ordinarily actionable." 99-2522, p. 20, 765 So.2d at 1030.
Reviewing the defendants' actions in the light of these principles, we are unable to find any manifest error in the trial court's findings that the conduct of which plaintiff complains did not fit within the parameters set out in White v. Monsanto, supra, and its progeny. Therefore, plaintiff failed to prove his claim for intentional infliction of emotional distress.

Defamation
Regarding his defamation claim, Singleton asserts the trial court erred in finding that the words used against Singleton were not defamatory because they were opinions. He argues:
[T]he words used and implied by Zeringue and Rebowe are defamatory per se because the words, by their nature, tend to injure Glen Singleton's personal and professional reputation. The undisputed evidence was defendants either told or stated in front of other co-workers that Mr. Singleton was a criminal, *496 accused him of being in jail, lazy, slow, didn't want to work, didn't do a "f___ thing," or a damn thing, did a lousy job on the baseball fields and claimed he used foul and abusive language.
Singleton contends such words clearly state facts or are opinions that imply certain facts exist.
Defendants argue that the trial court's ruling denying the defamation claim was not manifestly erroneous. Defendants contend a review of the testimony will show no witness testified that Zeringue called Singleton a "criminal" or said that he was "in jail," as alleged by Singleton. Further, they note that Singleton introduced no evidence of falsity of any statement positively attributed to Zeringue (e.g., that Singleton was "lazy"). Defendants also argue that plaintiff failed to prove that any statements were made with malice and failed to introduce evidence that plaintiff sustained injury or damage due to any defamatory statement attributed to defendants.
"In order to prevail in a defamation action, a plaintiff must necessarily prove four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." Trentecosta v. Beck, 96-2388 (La.10/21/97), 703 So.2d 552, 559. The plaintiff must prove that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages. Sassone v. Elder, 626 So.2d 345, 350 (La.1993).
A pure statement of opinion based totally on the speaker's subjective view, which does not expressly state or imply the existence of underlying facts, usually is not actionable in defamation, because falsity is an indispensable element of any defamation claim and a purely subjective statement can be neither true nor false. Bussie v. Lowenthal, 535 So.2d 378, 381 (La.1988).
"In sum, an expression of opinion is actionable only if it implies the existence of underlying facts ascertainable by a reasonable person with some degree of certainty, and the implied factual assertions are false, defamatory, made with actual malice, and concern another." Fitzgerald v. Tucker, 98-2313, p. 12 (La.6/29/99), 737 So.2d 706, 717.
"[T]he crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." Mashburn v. Collin, 355 So.2d 879, 885 (La.1977).
Here, the direct testimony from plaintiff's co-workers regarding allegedly defamatory statements was as follows: Brent White heard Zeringue say that plaintiff was "lazy" and "didn't want to work." Paul Tyler testified Zeringue used to say plaintiff was "lazy." Marcus Mott said one day when Zeringue was reading the newspaper, "[H]e said that Glen had went to jail for somebody was in his house, somebody had did a crime or whatever.... He was holding somebody in his house...that had did a crime." Steven Walker testified that "pretty much every day," Zeringue said "things like Glen works slow. He gets the job done but he works slow." Henry Pierre said he heard Zeringue say that Glen Singleton "didn't do a F'ing thing, that he was a lazy M-F."
Reviewing these statements, we find the statements regarding plaintiff being lazy or not wanting to work are clearly expressions of opinion. As such, they can be neither true nor false.
*497 Regarding the statements alleged to imply that plaintiff had been in jail, we find the evidence unclear as to what was said. In one part of Mott's testimony, Mott appeared to be saying that Zeringue said that plaintiff was in jail for having someone at his house who committed a crime. That was followed, however, by Mott's statement that plaintiff "was holding somebody in his house...that had did a crime." The evidence is unclear as to exactly what Zeringue said and, therefore, the allegation that Zeringue called plaintiff a criminal was not proven.
For the foregoing reasons, the judgment is affirmed. The parties are assessed their own costs for this appeal.
AFFIRMED.
NOTES
[1] Also plaintiffs in the action are Singleton's wife, Angeline, and his children, asserting claims for loss of consortium. Because the bulk of the claimed damages are Glen Singleton's, for ease of reference we refer to him as "plaintiff" in the singular.
[2] The last day Singleton actually worked was August 21, 1998; on August 24, 1998 he was admitted voluntarily to River Oaks Hospital for treatment of depression. After his hospitalization he did not return to work. He tendered a formal resignation on July 13, 1999.
[3] Plaintiff requested a jury trial, but the Parish refused to waive its statutory immunity to trial by jury.
[4] At the time of trial, plaintiff was no longer working at Monsanto because he was injured in a fall at work and had to undergo surgery. He stated he was still recovering at the time of trial.
[5] Singleton admitted to several instances of claims against former employers.
[6] We note that plaintiff-appellant's brief cited the circuit court's decision in the Nicholas caseNicholas v. Allstate Ins. Co., 30-735 (La.App. 2 Cir. 5/28/99), 739 So.2d 830but failed to inform us that the court of appeal's decision was reversed by the supreme court (see the citation footnoted here). Similarly, plaintiff-appellant's brief cited the circuit court decision in LaBove v. Raftery, 99-1414 (La.App. 3 Cir. 4/19/00), 759 So.2d 240 without noting that it was reversed by the supreme court at 00-1394 (La.11/28/01), 802 So.2d 566.