STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-1164


JOHN FORD DIETZ

VERSUS

ANNE BENNETT MORRISON DIETZ, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 88309-B
HONORABLE JULES D. EDWARDS, III, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Elizabeth A. Pickett, Judges.

AFFIRMED.


Amy, J., concurs in the result and assigns reasons.

John Ford Dietz
220 N. Zapata Highway, Number 11, PMB 546-A
Laredo, TX 78043
(505) 217-3516
PLAINTIFF/APPELLEE:
    In Proper Person

Richard Morrison
570 El Camino Real, Number 150-242
Redwood City, CA 94063
(650) 321-3729
DEFENDANT/APPELLANT:
    In Proper Person

**PETERS, J.**

Richard Morrison, one of the defendants in this litigation, appeals a trial court judgment awarding the plaintiff, John Ford Dietz, $85,000.00 in damages based on a finding that he and his co-defendant sister, Anne Bennett Morrison Dietz, conspired to defame, extort money from, and intentionally inflict emotional distress on Mr. Dietz. For the following reasons, we affirm the trial court judgment.

## DISCUSSION OF THE RECORD

John Ford Dietz (hereinafter referred to as "Mr. Dietz") and Anne Bennett Morrison Dietz (hereinafter referred to as "Mrs. Dietz") were formerly husband and wife; and Richard Morrison (hereinafter referred to as "Mr. Morrison"), who is an architect and interior designer by profession, is Mrs. Dietz's brother. At the time this matter was filed, Mr. Dietz resided in Louisiana, but as of the time of trial, he had moved to Texas. At all times during this litigation, Mrs. Dietz was a resident of Mexico, and Mr. Morrison was a resident of California.

The evidentiary record establishes that Mr. Dietz married his former wife in 1990, while he was enrolled in the Paul M. Hebert Law Center at Louisiana State University in Baton Rouge, Louisiana. He graduated from the Law Center in 1992, and the couple moved to Santa Fe, New Mexico, where he clerked for an appellate court judge for approximately two years before moving to Durango, Colorado.[1] In 1998, after having returned to New Mexico, the couple decided to move to San Miguel de Allende, Guanajuato, Mexico (hereinafter referred to as "San Miguel"). By the time they moved to Mexico, two children had been born of the marriage, Albert and Angus.

---

[1] Although Mr. Dietz graduated from a Louisiana law school, he never sat for the Louisiana Bar Examination to be licensed to practice law in Louisiana. However, he did become licensed to practice law in New Mexico, Colorado, the Navajo Nation, and other tribal jurisdictions.

In 2001, the couple purchased immovable property in downtown San Miguel, including the two-story building constructed thereon.[2] However, they placed title to the naked ownership of the property in the names of their minor children and reserved unto themselves a usufruct over the property.

One month later, in October of 2001, the couple obtained a divorce issued by a Mexican court. The original divorce decree provided that Mrs. Dietz would have custody of the minor children, with Mr. Dietz having unlimited visitation rights. Soon after the divorce, Mr. Dietz married Iniana Cardenas Dietz (hereinafter referred to as "Iniana" to distinguish her from Mrs. Dietz), a Mexican citizen. Additionally, because of circumstances present in her personal life, Mrs. Dietz voluntarily allowed the children to live with their father and Iniana, first in Acapulco, Mexico, and then back in San Miguel.

However, any semblance of post-marriage cooperation between the couple began to disappear with the passage of time. Most of the issues in dispute centered around the San Miguel immovable property, and matters came to a breaking point in January of 2006, when Mrs. Dietz hired a Mexican attorney named Ignacio Reyes Retana to review a proposal set forth by Mr. Dietz concerning the rental of part of the immovable property.

At trial, Mr. Dietz presented testimony from Mexican lawyers and United States citizens who had experience dealing with Mr. Reyes Retana, and all described him as anything but professional and ethical. He was described by witnesses as one who would corrupt the Mexican judicial system[3] in every way

---

[2] The evidentiary record is not totally clear concerning the nature of the building. It either contained two apartments at the time of purchase, or apartments were constructed in the building at a later time. In any event, the timing of the construction of the apartments is not critical to the disposition of the issues raised in this litigation.

possible and as a lawyer who would betray even his own client for his personal financial gain.

Mr. Dietz testified that almost immediately after his former wife hired Mr. Reyes Retana, he began receiving direct threats that he would be imprisoned on trumped-up charges; and he was subjected to other intimidation and harassment tactics originating from Mr. Reyes Retana and his agents or employees. In his testimony, he described his first meeting with Mr. Reyes Retana and Mrs. Dietz, at Mr. Reyes Retana's office in June of 2006, where he observed a stack of files, which he recognized as his personal and professional files from his office.[4] At a later time, Mr. Dietz testified that he met with one of Mr. Reyes Retana's associates and was told that there would be dire consequences if he did not pay Mrs. Dietz a large sum of money, transfer his usufruct in the San Miguel property to Mrs. Dietz, and cooperate in causing the children's ownership of the property to be transferred to her as well. Fearful for his safety, Mr. Dietz and his youngest son left Mexico for Gueydan, Vermilion Parish, Louisiana, where his parents lived and where his eldest son was visiting. Shortly thereafter, Iniana and their daughter joined him in Gueydan.[5]

Approximately one year later, in July of 2007, Mrs. Dietz filed a state action in Vermilion Parish, seeking the return of the children pursuant to the International Child Abduction Remedies Act, 22 U.S.C. § 9—1, et seq. (formerly 42 U.S.C. §

---

[3] The system was described as one where the criminal and civil systems overlapped in that if Mr. Reyes Retana did not obtain what he wanted, he simply had the offending party incarcerated on manufactured charges until he or she agreed to the result Mr. Reyes Retana sought.

[4] Mr. Dietz recognized them from the distinctive color coding and tab system present on the exterior of the files.

[5] While Mr. Dietz remembered that this occurred in June of 2007, Iniana recalled that her husband and stepson moved to Louisiana in May of 2007 and she and their daughter followed the next month.

11601, et seq.)[6] This action is referred to throughout the trial court testimony as "the Hague action," and for that reason, we will refer to it by that term as well. Mrs. Dietz obtained a temporary custody order from the trial court, but that order also included language that prohibited Mrs. Dietz and the children from leaving Louisiana pending a full hearing on the custody issue. Thereafter, with the temporary custody order in hand and accompanied by Vermilion Parish law enforcement officers, Mrs. Dietz physically appeared at the children's school and removed them to her custody. This occurred on August 20, 2007.

At some point after the trial court issued its temporary custody order, Mr. Dietz caused Mrs. Dietz's state action to be removed to the Federal District Court for the Western District of Louisiana, Lafayette Division. The federal district court also ordered Mrs. Dietz to remain within the court's jurisdiction pending a hearing on the custody issue. However, when the matter was called for hearing, Mrs. Dietz failed to appear because she had violated the court order by returning to Mexico and taking the children with her. The presiding judge in the federal district court proceeding issued a bench warrant for her arrest. Mr. Dietz and Iniana both testified that after Mrs. Dietz returned to Mexico, she refused to allow Mr. Dietz to communicate with the two children. Instead, she told the children that their father, not she, was an international fugitive and that she was their only hope.

On December 18, 2007, Mexican authorities took Mrs. Dietz into custody based on the bench warrant issued by the United States Federal District Court, and she and the children were subsequently returned to Louisiana. When the matter did proceed to trial on the Hague action, the federal district court ordered that the children be returned to Mrs. Dietz and returned to Mexico, the children's country

---

[6] The International Child Abduction Remedies Act codified the findings of the Convention on the Civil Aspects of International Child Abduction held at The Hague, Netherlands in 1980.

of habitual residence. *Dietz v. Dietz*, No. 07-1398, 2008 WL 4280030 (W.D. La. Sept. 17, 2008). The judgment also ordered that Mr. Dietz pay attorney fees to Mrs. Dietz. The federal district court executed a judgment to this effect on September 17, 2008, which was affirmed on appeal. *Dietz v. Dietz*, 349 Fed.Appx. 930 (5th Cir. 2009).

In October of 2008, Mr. Dietz moved with his wife and daughter back to San Miguel to be near the other children. He testified that as soon as he returned, Mr. Reyes Retana's office renewed the threats and efforts at intimidation and harassment. At one point, he was charged with the crime of aggravated bodily injury to Mrs. Dietz, for which he was acquitted on October 20, 2009. He continued to fight for custody of his children and, in 2009, a Mexican court granted him their provisional custody.

According to Mr. Dietz, the event that caused him to realize that he could not remain in Mexico occurred on August 11, 2010. He testified that on August 3, 2010, he received an anonymous phone call, wherein the caller threatened that if he did not transfer the San Miguel property to Mrs. Dietz, pay her the money she demanded, and dismiss all legal actions against her, he would be killed. Thereafter, on August 11, 2010, while driving to his home outside of San Miguel, occupants of a passing truck shot at him with at least three projectiles striking his vehicle. After this incident, Mr. Dietz and his family, including his two sons, left Mexico and moved to Texas, where they were residing at the time of trial.

The legal proceedings continued to evolve in Mexico and, on August 12, 2011, a Mexican court found Mrs. Dietz guilty of the crime of domestic violence against Albert and Angus Dietz. The court sentenced her to serve 365 days in jail

and ordered her to pay a fine to the children of $7,200.00 and $14,400.00 in Mexican pesos.

As this litigation clearly established, Mrs. Dietz was not satisfied in pursuing Mr. Dietz through the legal channels available to her in both Mexico and Louisiana; nor was she satisfied with the results achieved by Mr. Reyes Retana's strong-arm tactics. To exert even more pressure on Mr. Dietz, she enlisted the assistance of Mr. Morrison, who immediately engaged in what can best be described as a scorched earth campaign aimed directly at Mr. Dietz. This campaign began in earnest after Mr. Dietz moved to Louisiana in mid-2007. With the approval and encouragement of Mrs. Dietz, Mr. Morrison made demand on Mr. Dietz for his capitulation on a number of "Non-Negotiable" matters related to his sister, and when this was not successful, he proceeded to communicate derogatory assertions concerning Mr. Dietz to numerous agencies and individuals both inside and outside of Louisiana, many of whom were completely disconnected to the dispute between Mr. Dietz and his former wife; threatened him with the filing of professional complaints against him with the Colorado, New Mexico, and Navaho Nation Bar Associations; and causing the content of those complaints to be communicated to numerous other agencies and individuals. The not-so-subtle message in all of the communications to Mr. Dietz by Mr. Morrison was that all of Mr. Dietz's problems would disappear if he would simply give in to all of Mrs. Dietz's demands.

Perhaps the most egregious of Mr. Morrison's communications to third-parties were e-mails sent to Mr. Dietz's father, Albert Dietz, Sr., who lives in Gueydan. The first of these e-mails was sent September 7, 2007, a few days after his sister had left Louisiana with the children in violation of both the state and

6

federal district court orders. In that e-mail, Mr. Morrison informed Mr. Dietz's father that his son had multiple felony arrests in Mexico, was "an international fugitive," and that the father should intervene and cause Mr. Dietz to see the error of his ways. Mr. Morrison also stated to Mr. Dietz's father that "[Mr. Dietz's] ability to continue to practice law is now in jeopardy and he is facing some pretty serious consequences in Mexico."

When Mr. Dietz's father failed to respond immediately in the way he wished, Mr. Morrison forwarded a second e-mail to him on September 14, 2007. In this e-mail, Mr. Morrison expressed his disappointment in the father's lack of response and complained that Mr. Dietz's mother had somehow been "rude" to him. In a not-so-veiled threat, Mr. Morrison suggested that her rudeness had a price. Specifically, he stated that "[w]hile I'm sure she's not happy with the situation, I would think that she would be eager to do everything possible to maintain a positive relationship with Anne and me, not only for John's sake, *but [for] your own future relationship with your grandchildren.*" (Emphasis added.) Additionally, he informed Mr. Dietz's father that Mr. Dietz had "NO parental rights at the moment." (Emphasis in the original.) This comment was despite the fact that at the time, a warrant had been issued by the federal district court for Mrs. Dietz's arrest.

This second e-mail did go a long way in confirming what happened to the personal files stolen from Mr. Dietz's San Miguel office. While in his testimony, he denied any access to Mr. Dietz's files taken from his office, Mr. Morrison informed Mr. Dietz's father that he had "court judgments beyond what you've seen, photos, recorded answering machine messages, e-mails, bank statements and

account numbers, statements from John's Mexican legal assistants and other witnesses, computer files from abandoned computers, and more."

Even e-mails to Mr. Dietz were generally shared by Mr. Morrison with third-parties, including Mr. Dietz's father. Additionally, on October 23, 2007, Mr. Morrison faxed a letter to George Gardner, III, the principal of St. Peter School in Gueydan, where the children were enrolled before their mother removed them. In that letter, he apologized for Mrs. Dietz arriving at the school "with armed police officers," but without explanation, blamed that event on Mr. Dietz. The letter also described Mr. Dietz as having "a felony arrest warrant pending in Mexico for child abduction, along with other charges and judgments, including failure to pay court-ordered child support." This gratuitous language was added to the letter whose stated purpose was to request that the children's records be forwarded to a school in Mexico.

On December 3, 2007, Mr. Morrison informed Mr. Dietz by e-mail, with copies to third-parties including Mr. Albert Dietz, Sr., that he had followed through on his threat to file a complaint with the Colorado Supreme Court. In that same e-mail, he advised Mr. Dietz that he had prepared similar complaints which he intended to file with the New Mexico Disciplinary Board, as well as with the Navajo Nation. Mr. Morrison informed Mr. Dietz that these last two filings could be avoided if a resolution of Mrs. Dietz's matters could be reached. In his trial testimony, Mr. Morrison admitted that he later filed complaints with the State of New York Insurance Fraud Division and the United States Postal Fraud Investigative Department in an effort to put pressure on Mr. Dietz.

Mr. Morrison's campaign to pressure Mr. Dietz did not end after Mr. Dietz filed the February 8, 2008 action now before us, or even after Mr. Dietz and his

8

family returned to Mexico later in that year. In fact, after Mr. Dietz and his family returned to Mexico, Mr. Morrison began communicating by e-mail with a resident of San Miguel named Kurth Bousman and enlisted Mr. Bousman's help in spreading the assertions set forth in his previous e-mails. Mr. Bousman had his own dispute with Mr. Dietz, and Mr. Morrison was not above adding fuel to flame that situation. The e-mails between these two men introduced into evidence reflect an attempt by Mr. Morrison to expand on the purported criminal activity on the part of Mr. Dietz by suggesting that he was a part of an international money laundering operation. While professing to have no doubt concerning Mr. Dietz's involvement, Mr. Morrison stated in one e-mail that with regard to the parties involved with Mr. Dietz, he had nothing more than "major suspicions." Mr. Morrison also made it clear to Mr. Bousman in another e-mail that he wished to be very careful in what he did with regard to Mr. Dietz so "[he could] evade a lot of [Mr. Dietz's] questions." In the same e-mail, Mr. Morrison requested that Mr. Bousman be the buffer between him and Mr. Reyes Retana so that Mr. Dietz would not have discovery access to any connection between him and the lawyer.

The problem with all of Mr. Morrison's efforts to assist his sister is that as the trial court found in its reasons for judgment, his assertions were not only false, but he made no effort to check his "facts," and he had no independent knowledge of the accuracy or inaccuracy of his assertions. His defense was that he obtained all of the information from his sister, and he had no reason to doubt her. Additionally, while professing that he did not intend to damage anyone else by his actions, he considered Mr. Dietz a "deadbeat," had no regrets for what he did, and could care less about damage to Mr. Dietz.

9

A review of a number of other e-mails entered into evidence reflect that his actions were both with the direction and full support of Mrs. Dietz. On one occasion, Mrs. Dietz responded to a report from her brother with the comment that "YOU MADE MY DAY, DIRTY HARRY !!!!!!!!!!!!!!!!!!!!!!!!!!!! . . . Great Job, Richie POO." When Mr. Morrison copied her the e-mail where he made demand on Mr. Dietz for the "Non-Negotiable" issues, she responded by repeating the "DIRTY HARRY" comment and telling her brother to "GO GET EM." She ended that correspondence by stating that "you are so meannnnnnnnnnnnnnnnnnnnI love it." In perhaps the most honest assessment of their activities, in yet another e-mail Mrs. Dietz told her brother that "I almost think you are really having fun." When, on one occasion Mr. Morrison was required to give his sister some unpleasant news, her response was "I HATE HIM" in extra-large print.

With regard to the accuracy of Mr. Morrison's assertions, Mr. Dietz presented evidence from his two Mexican attorneys, who represented him in all of the San Miguel litigation, that parents do not lose "parental rights" in divorce proceedings and at no time had Mr. Dietz lost his parental rights; that when a parent subject to a Mexican court's child-support obligation obtains physical custody of the children, the obligation ceases without further action on the part of parent owing the support payment;[7] that Mr. Dietz owed no child support or alimony to Mrs. Dietz; and that no criminal proceedings were pending against him in Mexico.

---

[7] This is unlike Louisiana, where the parent subject to the payment order must return to court to have the order modified. *Halcomb v. Halcomb*, 352 So.2d 1013 (La.1977).

As previously stated, Mr. Dietz filed the instant action against Mr. Morrison and Mrs. Dietz on February 28, 2008,[8] seeking damages based on a number of different causes of action. Mr. Morrison and Mrs. Dietz both answered the petition and, thereafter, jointly filed a number of exceptions. Subsequent trial court hearings resulted in a reduction of the issues before the trial court, and the remaining issues proceeded to a six-day trial on the merits, commencing on November 7, 2011, and ending on January 10, 2012. At the close of the trial, the trial court took the matter under advisement.

On January 13, 2012, the trial court rendered a lengthy judgment which included its reasons for judgment. In that judgment, the trial court found that Mr. Morrison and Mrs. Dietz had defamed, extorted, and intentionally inflicted emotional distress on Mr. Dietz and set his damages at $85,000.00. Mr. Morrison and Mrs. Dietz responded to this judgment by filing a motion for a new trial, based on the trial court's failure to apportion fault between the two defendants and to apportion fault among a number of other individuals against whom testimony was entered at trial. Additionally, the defendants asserted in their motion for new trial that the trial court erred in finding that a civil cause of action for extortion exists under Louisiana law; erred in finding that it had personal jurisdiction over Mr. Morrison with respect to a number of the claims; and erred in finding that the actions of the defendants arose to a level sufficient to support a finding of intentional infliction of emotional distress or that Mr. Dietz even suffered emotional distress.

Following a May 14, 2012 hearing on the motion for new trial, the trial court prepared and executed an amended judgment denying the motion for new trial.

---

[8] Mr. Dietz amended his petition to correct paragraph numbering on April 3, 2008, then filed a supplemental petition on February 18, 2010, and a second supplemental petition on November 12, 2010.

The amended judgment included all of the language of the original judgment with clarifying language "to correct the phraseology of the 13 January 2012 Judgment to explicitly state that which was only implied in the prior judgment." (Emphasis in the original.) The added language was to make it clear that the trial court had concluded that Mr. Morrison and Mrs. Dietz engaged in a conspiracy to defame, extort, and to intentionally inflict emotional distress on Mr. Dietz and, therefore, were solidarily liable for the amount of the judgment.

On July 17, 2012, Mr. Dietz sought and obtained a devolutive appeal of this May 23, 2012 judgment. Nine days later, on July 26, 2912, Mr. Morrison and Mrs. Dietz also sought and obtained a joint motion for devolutive appeal. Rather than consider the matter on the merits, a separate panel of this court set aside both the original and amended judgments based on a finding that neither satisfied the form requirements of La.Code Civ.P. art. 1918.[9] *Dietz v. Dietz*, 13-186 (La.App. 3 Cir. 11/6/13), 128 So.3d 1215. Additionally, the panel held that the amended judgment resulted in a substantive change from the original judgment, in violation of La.Code Civ.P. art. 1951,[10] and that this substantive change rendered the amended judgment null and void. Concluding that this court had no final judgment to review, the panel dismissed the appeal filed by Mr. Morrison and Mrs. Dietz,[11] and remanded the matter to the trial court "for further proceedings and the entry of a final appealable judgment." *Dietz*, 128 So.3d at 1220.

---

[9] Louisiana Code of Civil Procedure Article 1918 provides, "A final judgment shall be identified as such by appropriate language. When written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment."

[10] Louisiana Code of Civil Procedure Article 1951 provides, in part: "On motion of the court or any party, a final judgment may be amended at any time to alter the phraseology of the judgment, but not its substance, or to correct errors of calculation."

[11] The opinion did not mention Mr. Dietz's appeal.

On remand, the trial court issued new reasons for judgment and, on May 19, 2014, executed a written judgment which reads in pertinent part:

> **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that for the reasons assigned in the attached Reasons for Judgment, this court finds that the plaintiff has proven the elements of defamation, extortion, intentional infliction of emotional distress, and civil conspiracy. Accordingly, Anne Bennett Morrison Dietz and Richard Morrison shall pay unto John Ford Dietz the sum of Eighty Five Thousand Dollars and 00/00 ($85,000.00). The defendants were equally at fault for causing the plaintiff's damages and are therefore jointly and solidarily liable.
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Judicial Interest in the amount of Seventeen Thousand Four Hundred Sixty Three Dollars and 32/00 ($17,463.32) is awarded to the plaintiff from the date of Judicial Demand (February 28, 2008) through the original judgment (January 13, 2012). All costs associated with these proceedings are assessed to the defendants equally.

The attached reasons for judgment constituted a very slightly altered repeat of the reasons found in both the original and amended judgment rendered by the trial court and read, in pertinent part, as follows:

> The above captioned matter was presented to the court as a trial on the merits commencing on 7 November 2011 and concluding 9 January 2012. Present in court were John Ford Dietz, in proper person[,] and Thomas Thomassie representing defendants Anne Bennett Morrison Dietz and Richard Morrison. After considering the pleadings filed herein, the applicable law, testimony, and evidence submitted, the court renders the following judgment:
>
> This case is a branch of an ongoing property dispute between the plaintiff and his ex-wife Anne Bennett Morrison. The plaintiff and defendant Anne Morrison Dietz were married and have two children, Albert and Angus Dietz. The parties purchased property in Mexico and each acquired an undivided life estate interest in the property with the children each acquiring undivided fee estates therein. Ms. Morrison's brother joined his sister in this dispute and has taken a property interest in it. John Dietz filed a lawsuit seeking damages from Defendants Anne Morrison Dietz and Richard [Morrison], for defamation, extortion, and intentional infliction of emotion distress.

## Defamation Claim:

To prevail in a defamation action, the plaintiff must necessarily prove four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. The elements of defamation include a false defamatory statement concerning another; an unprivileged communication to a third party; fault on the part of the publisher; and, resulting injury. Words that convey an element of personal disgrace, dishonesty, or disrepute are defamatory. Thus, in order to prevail on a defamation claim, the plaintiff must prove that the defendants, with actual malice or other fault, published a false statement with defamatory words which cause plaintiff damages. *Costello v. Hardy*, 03-1146, p. 13 (La.1/21/04), 864 So.2d 129, 140.

**As to plaintiff's defamation claim, testimony and evidence revealed the following:**

Anne Morrison accused the plaintiff of committing numerous criminal offenses in Mexico when she possessed insufficient evidence to support these allegations. The criminal allegations were for the purpose of applying pressure on the plaintiff in her ongoing negotiations over a property dispute.

On 7 September 2007 Richard Morrison emailed Albert Dietz (the plaintiff's father) a message containing the following language: "…John has multiple felony arrest warrants for him in Mexico and is currently an international fugitive." This statement was not true.

On 7 September 2007 Richard Morrison sent an email to Albert Dietz containing the following language: "…now we will need to take more assertive actions which may have more substantial consequences for him…. John has NO parental rights at the moment, and the contact with his children is currently at Anne's sole discretion. John has substantially failed in his legal obligations (which he set up himself) of financial support, to the tune of tens of thousands of dollars. The level of arrearages in child support payments alone would likely be sufficient to qualify as a federal crime under the guidelines of the Child Support Recovery Act of 1992 (SCRA) (18 U.S.C. '228), and the collection consequences and fines under this Act can get pretty draconian, as you may know…. It is astonishing to me that John doesn't see the wisdom of providing his full cooperation right now, given what is at risk for him combined with his extremely well documented bad acts…. We are fully prepared to play "hardball" extremely swiftly and aggressively, and if this course is chosen by John, there will be no going back. I feel sorry for all the pain this must be causing you and your family, but we are at the end of the road with John, and the situation needs to change immediately." Mr.

Morrison's assertion of "no parental rights", contact with the children, and child support obligations was legally incorrect.

On 21 October 2007, Richard Morrison faxed a letter to Mr. Skip Gardner, who is the principal of the school that Albert, Jr. and Angus previously attended, St. Peter School in Gueydan, Louisiana. Mr. Morrison also faxed a copy of that letter to Charlie Fitzgerald who is an attorney who represented Ann Morrison. That letter contained the following statement: "Mr. Dietz…has a felony arrest warrant pending in Mexico for child abduction…["] That statement was untrue.

The plaintiff is licensed to practice law in three jurisdictions. Richard Morrison filed several bar complaints against the plaintiff (Colorado, New Mexico, and the Navaho Nation). The bar complaint to the Navaho Nation contains the following allegations:

- "Child abduction and actions prejudicial to the administration of justice.

- Misrepresentation, deceit, and/or fraud to U.S. and Mexican courts, as well as U.S. and Mexican law enforcement authorities.

- Willfully and knowingly aiding and abetting his clients to circumvent a plea agreement.

- Concealment of large amounts cash income from authorities

- Willfully defrauding multiple creditors and my sister.

- Running a law office out of Mexico contrary to the laws of the jurisdiction, and failure to provide adequate supervision of his employees and work product.

- Taking cash fees from clients "under the table," with disregard of trust fund requirements.

- Willful failure to pay court ordered child support and alimony."

Mr. Morrison testified he transmitted these bar complaints to Mr. Kurth Bousman in Mexico. Mr. Morrison encouraged Mr. Bousman to transmit the allegations contained in those bar complaints to several people including the plaintiff's father, Gary Risley an attorney who was a party defendant in civil action initiated by the plaintiff, and also to Ed Clancy, a U.S. State Department official stated in Mexico. In an email message to Bousman, Mr. Morrison acknowledged his plan to use the bar complaints to motivate the

plaintiff's clients to terminate their business relationship with the plaintiff. Mr. Morrison also acknowledged his lack of proof regarding the allegations presented in the bar complaints. Although Mr. Morrison encouraged Bousman to transmit the substance of the allegations, he cautioned Bousman against copying the actual bar complaints themselves and distributing them. Mr. Morrison thought that action could give the plaintiff a civil cause of action. Mr. Morrison also assisted with the drafting of a letter to a federal prosecutor or federal judge in Texas. This letter contained versions of these allegations. Similarly Mr. Morrison assisted Anne Morrison with the drafting of a letter to a U.S. State Department official Ed Clancy, containing versions of these allegations. Mr. Morrison testified that he initiated a complaint with insurance fraud investigators in New York. Mr. Morrison also testified that he had no personal knowledge of any facts that would support those allegations, and that this information was provided by his sister and Bousman[,] who is an individual who had a personal vendetta against the plaintiff. Accordingly, this court finds that the language contained in the emails and writings to third parties intended to injure Dietz's personal and professional reputation and constituted defamation.

## Extortion Claim:

Extortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description. To prove extortion, the plaintiff must prove that the defendants threated to accuse him of a crime; that the defendants threatened to impose disgrace to him; or that the defendants threatened to do him harm.

In the present case, plaintiff presented evidence of three e-mails he received from Richard Morrison demanding that plaintiff deliver: 1) approximately $72,000 which Morrison asserts plaintiff owed his sister for back due child support and alimony payments; 2) all ownership interest in a residential structure and the land upon which it was built in Mexico; 3) approximately $12,000 in legal fee associated with federal litigation in Lafayette La; and 4) the return of certain movable property that Richard asserted was owned by his sister Ann[e]. On 6 November 2007 Mr. Morrison sent the plaintiff an email which appears to threaten the initiation of a bar complaint in an effort to collect the four items which were previously demanded. On 3 December 2007, Mr. Morrison sent the plaintiff an email titled "Dietz/Next Collection Step". This message advises of the lodging of a bar complaint regarding the plaintiff's conduct with the disciplinary officials of Colorado and a plan to send a similar complaint to the relevant officials in New Mexico and the Navaho Nation in about a week. Mr. Morrison testified that he in fact did send those complaints to those officials in an attempt to convince plaintiff to deliver the demanded property.

The plaintiff also presented evidence of an email dated 2 February 2010, from Richard Morrison to plaintiff which contained the following language: "Subject: RE: SETTLEMENT COMMUNICATION… As I mentioned to your father, you should be aware that the Colorado Disciplinary Counsel has reviewed your California lawsuit in committee, and has asked me to put together a formal complaint for use by their trial division. I have now done this at their request.… I have held off serving the federal complaint as long as I can, in hopes of seeing some positive developments.… The Mexican attorneys have indicated to my sister that if I were to prevail in this 18 U.S.C. 2511 claim, as I expect to, that they would be able to easily take advantage of Articulo 177.… You have the opportunity to turn down the heat dramatically, but the window of opportunity is closing rapidly. If you have a proposal that you think will move things forward in a positive direction, I would be very receptive to hearing it. I'm sure that we can find a solution that will be far less costly to all concerned than the path currently traveled."

This court finds that the actions of the defendants satisfy all of the elements of the crime of extortion as defined in LA R.S. 14: 66.

### Intentional Infliction of Emotional Distress:

In order to recover damages for intentional infliction of emotional distress, the plaintiff must prove that the conduct of the defendants was extreme and outrageous; that the emotional distress suffered by the plaintiff was severe; and that the defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially result from his conduct. The conduct of the defendant must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

This court finds that the conduct of the defendants as outlined above and below was outrageous and extreme [and] caused the plaintiff to suffer severe emotional distress. Anne Morrison Dietz refused to allow plaintiff to speak to his children from the time they were taken from school in Gueydan on 20 August 2007 to December 2007. Plaintiff has documented 136 phone calls to Ms. Morrison during the period 26 September to 18 December 2007. She did not let plaintiff speak to the boys. During this time period she told the boys that their father was an international fugitive. This conduct produced negative personality changes in Angus and severe emotional distress to plaintiff. This particular method of extortion by Mr. Morrison and Ms. Morrison, coupled with Mr. Morrison's harmful conduct directed towards the plaintiff's father was outrageous, extreme and calculated to (and did in fact) cause the plaintiff to suffer severe emotional distress.

17

Anne Morrison and Richard Morrison authorized their Mexican attorney to use intense tactics against the plaintiff.

On 8 October 2009, Ann[e] Morrison transmitted an email message to plaintiff containing a death threat.

Anne Morrison and Richard Morrison were not credible witnesses and were inaccurate historians.

The actions described above were acts taken in furtherance of the conspiracy of this brother and sister to inflict emotional distress on the plaintiff by producing emotional stress on his family members and presenting false statements to third parties for the purpose of convincing the plaintiff to surrender certain property to Anne Morrison. These defendants enlisted the assistance of various third parties in furtherance of this conspiracy. These defendants intended their actions to produce the desired effects on the plaintiff while he was residing in Louisiana. They desired him to take the requested actions while he was residing in Louisiana. Thus, the defendants Anne Bennett Morrison Dietz and Richard Morrison are solidarily liable to the plaintiff for the damages caused by their tortuous conduct.

**Damages**

The plaintiff has proven the elements of defamation and extortion and that the defendants had formed the specific intent that their actions should cause the plaintiff to suffer severe emotional distress.

(References to trial transcript page and line numbers have been deleted).

Thereafter, on July 24, 2014, the trial court executed an order granting Mr. Morrison a devolutive appeal of the May 19, 2014 judgment. Mrs. Dietz did not appeal the judgment; thus, the judgment as to her is final.

On appeal, Mr. Morrison raises seven assignments of errors:

1.  The [t]rial [c]ourt lacked personal jurisdiction over [Mr. Morrison] with respect to numerous claims arising out of conduct and activities that had no connection with the Louisiana forum, including some which were prescribed on the face of [Mr. Dietz's] Petition, yet still awarded damages based on these activities;

2.  The [t]rial [c]ourt erred by failing to allocate fault to both parties and non-parties who caused and/or contributed to John's alleged injury despite Louisiana's mandatory comparative fault principles codified in La. C.C. art. 2323;

3.   The trial court erred in finding a conspiracy between [Mrs. Dietz] and [Mr. Morrison] and consequent in solido liability;

4.   The trial court erred by awarding damages for the civil tort of "extortion," although neither the Third Circuit nor the Louisiana Supreme Court has recognized the existence of such a tort, and awarded damages in the absence of any damages;

5.   The trial court erred in awarding damages for the tort of Intentional Infliction of Emotional Distress ("IIED");

6.   The trial court erred in awarding damages for alleged false defamatory statements that were shown at trial to be, in fact, patently or substantially true, and awarded damages thereon without a showing of any injury by [Mr. Dietz];

7.   The trial court erred in awarding damages based on numerous material factual findings that were unsupported and/or contradicted by the evidence.

## OPINION

It is well settled that a trial court's findings of fact are reviewed on appeal pursuant to the manifest error—clearly wrong standard of review. *Snider v. La. Med. Mut. Ins. Co.*, 13-579 (La. 12/10/13), 130 So.3d 922.

Under the manifest error standard of review, a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). There is a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). *See Stobart v. State, Department of Transportation and Development*, 617 So.2d 880, 882 (La.1993). *See also Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). Thus, the issue to be resolved by a reviewing court is not whether the trier-of-fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State, Department of Transportation and Development*, 617 So.2d at 882.

Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous.

19

*Id.* at 938.

With regard to offenses and quasi offenses, which include the category of "torts," La.Civ. Code art. 2315 provides in pertinent part that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The three offenses at issue in this litigation are categorized as intentional acts.

> In Louisiana, in order to constitute an intentional act, the actor must either "(1) consciously desire the physical result of the act, whatever the likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result." *Batiste v. Bayou Steel Corp.*, 10-1561 (La.10/1/10), 45 So.3d 167, 168 (citing *Bazley* [*v. Tortorich*, 397 So.2d 475 (La.1981))]. To rise to the level of an intentional tort, a plaintiff must establish that the actor knew with such certainty that the injuries were substantially certain to follow, that a denial of that knowledge is not believable. "Substantially certain to follow" requires more than a reasonable probability than an injury will occur and "certain" has been defined to mean "inevitable" or "incapable of failing." *Jasmin v. HNV Cent. Riverfront Corp.*, 94-1497, p. 2 (La.App. 4 Cir. 8/30/94), 642 So.2d 311, 312.

*McClain v. City of New Orleans*, 13-1291, p. 10 (La.App. 4 Cir. 3/5/14), 137 So.3d 671, 678, *writ denied*, 14-717 (La. 5/23/14), 140 So.3d 726.

### *ASSIGNMENT OF ERROR NUMBER ONE*

In his first assignment of error, Mr. Morrison argues that the trial court erred in exercising personal jurisdiction over him for claims made by Mr. Dietz which had no connection to Louisiana. He claims that he lacked sufficient minimum contacts with Louisiana and that the trial court's exercise of jurisdiction over him, a California resident, will offend traditional notions of fair play and substantial justice.

We need not reach the "minimum contacts" issue because Mr. Morrison subjected himself to the jurisdiction of the trial court by filing an answer in Mr.

Dietz's suit before raising the jurisdictional question. Louisiana Code of Civil Procedure Article 6(A)(3) provides:

> A. Jurisdiction over the person is the legal power and authority of a court to render a personal judgment against a party to an action or proceeding. The exercise of the jurisdiction requires:
>
> . . . .
>
> (3) The submission of the party to the jurisdiction of the court by the commencing an action or by the waiver of objection to jurisdiction by failure to timely file the declinatory exception.

Louisiana Code of Civil Procedure Article 925(A)(5) provides that "[t]he court's lack of jurisdiction over the person of the defendant" may be raised through the filing of a declinatory exception. Failure to timely file the declinatory exception results in a waiver of the objection to personal jurisdiction. La.Code Civ.P. art. 925(C). Additionally, except for various minor preliminary matters,[12] the "declinatory exception . . . shall be pleaded prior to or in the answer." La.Code Civ.P. art. 928(A).

In the matter before us, Mr. Dietz filed his original petition on February 28, 2008, and Mr. Morrison filed a proper-person answer on March 22, 2010. Mr. Morrison's later-retained counsel filed the exception of lack of personal jurisdiction on January 8, 2011. Mr. Morrison's answer subjected him to the jurisdiction of the trial court, and we find this assignment of error to have no merit.

### ASSIGNMENTS OF ERROR NUMBERS FOUR, FIVE, AND SIX

The second and third assignments of error relate to apportionment of fault and the trial court's finding of a conspiracy between Mr. Morrison and Mrs. Dietz. The next three assignments of error relate to the finding of fault in the three

---

[12] These preliminary matters are "the entry or removal of the name of an attorney as counsel of record, extension of time within which to plead, security for costs, or dissolution of an attachment issued on the ground of the nonresidence of the defendant, and in any event, prior to the confirmation of a default judgment." La.Code Civ.P. 928(A).

different categories: defamation, extortion, and intentional infliction of emotional distress. Because only Mr. Morrison has appealed, we will consider these three assignments of error before addressing the first two.

*Defamation*

In its reasons for judgment, the trial court referenced *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So.2d 129, to establish the elements required to be proven in a defamation case. While we find that reference to be totally accurate, we further find the language that follows the specific language establishing the necessary elements to be helpful in the analysis of this litigation.

> Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. *Fitzgerald v. Tucker*, 98-2313, p. 10 (La.6/29/99), 737 So.2d 706, 715; *Trentecosta v. Beck*, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; *Sassone v. Elder*, 626 So.2d 345, 350 (La.1993). "Four elements are necessary to establish a defamation cause of action: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Trentecosta*, 96-2388 at 10, 703 So.2d at 559 (citing RESTATEMENT (SECOND) OF TORTS § 558 (1977)). The fault requirement is often set forth in the jurisprudence as malice, actual or implied. *See, Cangelosi v. Schwegmann Bros. Giant Super Markets*, 390 So.2d 196, 198 (La.1980) (which also considers falsity as a fifth and separate element); 12 WILLIAM E. CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.4 at 312 (2000). Thus, in order to prevail on a defamation claim, a plaintiff must prove " 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.' " *Trentecosta*, 96-2388 at 10, 703 So.2d at 559 (quoting *Sassone*, 626 So.2d at 350). If even one of the required elements of the tort is lacking, the cause of action fails. *Douglas v. Thomas*, 31,470, p. 3 (La.App. 2 Cir. 2/24/99), 728 So.2d 560, 562 *writ denied*, 99-0835 (La.5/14/99), 741 So.2d 661; *Kosmitis v. Bailey*, 28,585, p. 2 (La.App. 2 Cir. 12/20/96), 685 So.2d 1177, 1180.
>
> Defamatory words are, by definition, words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise expose a person to contempt or ridicule. *Fitzgerald*, 98-2313 at 11, 737 So.2d at 716; *Trentecosta*, 96-2388 at 10, 703 So.2d at 559 (citing RESTATEMENT (SECOND) OF TORTS § 559 cmt. (e) (1977)). Words which convey an element of

personal disgrace, dishonesty, or disrepute are defamatory. *Fitzgerald*, 98-2313 at 11, 737 So.2d at 716. The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court. *Sassone*, 626 So.2d at 352. The question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. *Id.* To be actionable, the words must be communicated or "published" to someone other than the plaintiff. *Kosmitis*, 25,585 at 3, 685 So.2d at 1180.

In Louisiana, defamatory words have traditionally been classified into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. *Lemeshewsky v. Dumaine*, 464 So.2d 973, 975 (La.App. 4 Cir.1985). Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se. *Kosmitis*, 28,585 at 4, 685 So.2d at 1180; *Lemeshewsky*, 464 So.2d at 975; 12 CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.8 at 315. When a plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant. *Kosmitis*, 28,585 at 4, 685 So.2d at 1180. The element of injury may also be presumed. *Id.*

When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, the elements of falsity, malice (or fault) and injury. *Kosmitis*, 28,585 at 4, 685 So.2d at 1180. In cases involving statements made about a public figure, where constitutional limitations are implicated, a plaintiff must prove actual malice, *i.e.*, that the defendant either knew the statement was false or acted with reckless disregard for the truth. *See, Romero v. Thomson Newspapers (Wisconsin), Inc.*, 94-1105, p. 5 (La.1/17/95), 648 So.2d 866, 869.

The injury resulting from a defamatory statement may include nonpecuniary or general damages such as injury to reputation, personal humiliation, embarrassment and mental anguish even when no special damage such as loss of income is claimed. *Kosmitis*, 28,585 at 4, 685 So.2d at 1180. Regardless of the type of injury asserted, however, a plaintiff must present competent evidence of the injuries suffered. *Id.* at 28,585 at 5, 685 So.2d at 1181. A plaintiff must also demonstrate that the defamatory statements were a substantial factor in causing the harm. *Id.* (citing *Taylor v. Town of Arcadia*, 519 So.2d 303, 306 (La.App. 2 Cir.), *writ denied*, 522 So.2d 1097 (La.1988)).

Finally, even when a plaintiff makes a prima facie showing of the essential elements of defamation, recovery may be precluded if the

> defendant shows either that the statement was true, or that it was protected by a privilege, absolute or qualified. *Doe v. Grant*, 01-0175, p. 9 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 416, *writ denied*, 03-0604 (La.5/2/03), 842 So.2d 1102; *Arledge v. Hendricks*, 30,588, p. 4 (La.App. 2 Cir. 6/26/98), 715 So.2d 135, 139.

*Id.* at 140-41.

Included within the communications by Mr. Morrison to third parties were statements expressly accusing Mr. Dietz of criminal conduct, as well as statements intended to injure Mr. Dietz's personal and professional reputation. As pointed out in *Costello*, such statements are defamatory per se, and their falsity and malice are presumed. The burden then shifted to Mr. Morrison to rebut this presumption, and he clearly failed in that effort.

As previously noted, Mr. Morrison testified that in communicating the information concerning Mr. Dietz's criminal, personal, and professional reputation, he relied totally on what his sister told him. Not only did he not make any effort to check the validity of his accusations, but his general demeanor while testifying indicated that accuracy was not necessarily important to him as long as Mr. Dietz complied with his demands. The trial court rejected Mr. Morrison's testimony, finding him less than credible.

The trial court also found that a number of the other statements forwarded to third parties, which did not accuse Mr. Dietz of a crime or which did not tend to injure his personal or professional reputation, were false and defamatory, unprivileged, and made with the intent to harm Mr. Dietz. In fact, not only did Mr. Morrison communicate these false statements to third parties, but he acknowledged that he encouraged one of those parties, Mr. Bousman, to further communicate the falsehoods to other parties.

24

With regard to both the defamatory per se statements and those others susceptible of a defamatory meaning, the trial court factually concluded that the clear intent of both Mr. Morrison and Mrs. Dietz, in communicating them to third parties, was to cause Mr. Dietz damage; and that Mr. Dietz did in fact suffer damage. Thus, the trial court concluded that both Mr. Morrison and Mrs. Dietz were liable to Mr. Dietz for the tort of defamation. We find no manifest error in the trial court's factual findings relative to the defamation cause of action and find no merit in Mr. Morrison's assignment of error addressing this cause of action.

***Extortion***

We find no Louisiana jurisprudence establishing the civil tort of extortion.[13] However, we do find the criminal law on the subject to be instructive. Louisiana Revised Statutes 14:66 provides:

> A. Extortion is the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description. Any one of the following kinds of threats shall be sufficient to constitute extortion:
>
> (1) A threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him.
>
> (2) A threat to accuse the individual threatened or any member of his family or any other person held dear to him of any crime.
>
> (3) A threat to expose or impute any deformity or disgrace to the individual threatened or to any member of his family or to any other person held dear to him.
>
> (4) A threat to expose any secret affecting the individual threatened or any member of his family or any other person held dear to him.

---

[13] Mr. Dietz cites this court to the holding in *Burnham Broadcasting Company v. Williams*, 629 So.2d 1335 (La.App. 4 Cir. 1993), *writ denied*, 94-150 (La. 2/25/94), 632 So.2d 770, *cert. denied*, 513 U.S. 814, 115 S.Ct. 69 (1994), as authority for a finding that such a cause of action exists under Louisiana law. However, because the decision was based on the application of that portion of the federal Racketeer Influenced and Corrupt Organizations law (RICO) dealing with extortion, the appellate court pretermitted any discussion concerning any claim of extortion under state law.

25

(5) A threat to cause harm as retribution for participation in any legislative hearing or proceeding, administrative proceeding, or in any other legal action.

(6) A threat to do any other harm.

B. Whoever commits the crime of extortion shall be imprisoned at hard labor for not less than one nor more than fifteen years.

Had Mr. Morrison been charged with the offense of extortion, as defined in the criminal law, the State of Louisiana would have been required to establish that he (1) communicated threats to Mr. Dietz (2) with the intent of obtaining something of value from Mr. Dietz. The scenarios set forth in La.R.S. 14:66(A)(1-6) are illustrative and not exclusive, and the burden of the State of Louisiana would be proof of every element beyond a reasonable doubt. La.R.S. 15:271.

The trial court found, and a preponderance of the evidence establishes, that Mr. Morrison communicated threats to Mr. Dietz to obtain money, property, and other things of value; and that he did so by threatening to do harm to Mr. Dietz's parents by denying them access to their grandchildren, threatening to communicate to others that Mr. Dietz was involved in criminal activity, and threatening to expose Mr. Dietz's personal and professional activities to various professional and governmental agencies. The trial court further found that Mr. Dietz sustained damages as a result of these extortion efforts.

While we find no error in the trial court's factual findings in this regard, we decline to recognize a separate civil cause of action for extortion. However, that does not mean that we do not consider this evidence in the ultimate disposition of this litigation. Instead, we find that Mr. Morrison's actions in this regard should be categorized as part of the intentional infliction of emotional distress cause of action. Thus, while we find merit in Mr. Morrison's assignment of error questioning the

finding of a separate cause of action for extortion, we find that to be a distinction without a difference.

*Intentional Infliction of Emotional Distress*

In the recent case of *Mahfouz v. Davenport*, 14-358, pp. 12-13 (La.App. 3 Cir. 10/1/14), 149 So.3d 845, 855, this court set forth the elements which must be established by a preponderance of the evidence to support an award for damages caused by the intentional infliction of emotional distress on an individual:

> In order to assert such a claim, a plaintiff must establish that 1) the defendant's conduct was extreme and outrageous; 2) that the plaintiff's emotional distress was severe; and 3) that the defendant desired to inflict severe emotional distress or knew that it would be certain or substantially certain to result from his conduct. *Guilbeaux* [*v. Times of Acadiana, Inc.*, 94-1270 (La.App. 3 Cir. 8/9/95)], 661 So.2d 1027 [, *writ denied*, 95-2942 (La. 3/29/96), 670 So.2d 1238]. "Extreme and outrageous conduct" is that which is "so atrocious as to pass the boundaries of decency and to be utterly intolerable to civilized society." *Id.* at 1033. However, conduct that is intended to cause some lesser degree of humiliation or embarrassment is insufficient to constitute extreme and outrageous conduct. *Id.* Further, "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities" do not constitute extreme and outrageous conduct. *Preis v. Durio*, 94-468, p. 3 (La.App. 3 Cir. 11/2/94), 649 So.2d 600, 602, *writ denied*, 94-2949 (La.1/27/95), 649 So.2d 393.

The trial court found that Mr. Dietz established all of the elements set forth in *Mahfouz*, and we find no manifest error in that factual finding. The summary of the evidence already set forth herein, as well as that expressed by the trial court in its reasons for judgment, establish without question that the actions of Mr. Morrison and his sister fit within the parameters as set forth in *Mahfouz* and the jurisprudence cited therein.

Additionally, it is clear from Mr. Morrison's testimony that he desired to inflict severe emotional distress on Mr. Dietz. In his testimony, Mr. Morrison professed to not wish any distress on anyone *except* Mr. Dietz. With regard to Mr. Dietz, he expressed no regrets, could care less what damages Mr. Dietz sustained,

27

and asserted that emotional distress was not a part of the equation in collecting from a "deadbeat."

We find no merit in this assignment of error.

## *ASSIGNMENT OF ERROR NUMBER TWO*

In his second assignment of error, Mr. Morrison asserted that the trial court erred in failing to allocate fault among all parties and non-parties who caused or contributed to Mr. Dietz's injuries as required by La.Civ.Code art. 2323.

Louisiana Civil Code Article 2323 provides:

> A.  In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.  If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

> B.  The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

> C.  Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

The trial court did comply with the requirements of La.Civ.Code art. 2323 in that it found that Mr. Dietz's damages were caused equally by Mr. Morrison and Mrs. Dietz.  Mr. Morrison asserts that the assessment of fault was in error in that the fault of other individuals, specifically Mr. Reyes Retana and Mr. Bousman, should have been calculated into the equation such that his personal fault should be significantly reduced.  We find no merit in this argument.

28

The record establishes that Mr. Reyes Retana became a part of the dispute before Mrs. Dietz enlisted the assistance of Mr. Morrison, and Mr. Morrison went to great lengths in his testimony to explain that he had no connection to the Mexican lawyer. Additionally, while the record contains a significant amount of e-mail correspondence between Mr. Morrison and Mr. Bousman, all of Mr. Bousman's comments have been redacted, and anything Mr. Bousman may had done was in response to direct instructions from Mr. Morrison.

We find no merit in this assignment of error.

### ASSIGNMENT OF ERROR NUMBER THREE

In this assignment of error, Mr. Morrison asserts that the trial court erred in finding that he and his sister were involved in a conspiracy to harm Mr. Dietz such that they should be found liable in solido for Mr. Dietz's damages. We find no merit in this argument as La.Civ.Code art. 2324(A) provides that "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."

The trial court found that Mr. Morrison and Mrs. Dietz conspired to do harm to Mr. Dietz. We find no manifest error in that factual finding and, therefore, Mr. Morrison and Mrs. Dietz are solidarily liable for the damages they caused Mr. Dietz.

There is no merit in this assignment of error.

### ASSIGNMENT OF ERROR NUMBER SEVEN

In this assignment of error, Mr. Morrison argues that the evidentiary record fails to establish that Mr. Dietz sustained any injury from Mr. Morrison's defamatory statements about him or that he sustained any emotional distress from

the other actions of Mr. Morrison and Mrs. Dietz.  We find no merit in either of these arguments.

While Mr. Dietz testified that he certainly had stress before Mr. Morrison became involved, his situation became much worse and more intense when his brother-in-law started his activities.  According to Mr. Dietz, the whole experience has been a nightmare for him and his family.  Iniana testified that after the children returned to Mexico with Mrs. Dietz, her husband began to lose weight and suffered many personality changes.  He lost his ability to concentrate on matters and became forgetful, became a recluse, and reduced his working activity to working on his personal problems and nothing else.  She stated that he became short-tempered and, when he received any of the e-mails, he became further upset.  Iniana also pointed out that Mr. Dietz sustained even greater stress when faced with what Mr. Morrison put his mother and father through and that he was forced to see his father crying and shaking when the two men tried to discuss the matter.  Mr. Dietz's mother, father, and brother testified as to the stress he was under and the effect it had on his personality.  We find no merit in Mr. Morrison's argument that Mr. Dietz sustained no injury.

We find no merit in this assignment of error.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in favor of the plaintiff, John Ford Dietz, and against the defendant, Richard Morrison, awarding John Ford Dietz damages in the amount of $85,000.00.  We assess all costs of this appeal to Richard Morrison.

**AFFIRMED.**

NUMBER 14-1164

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JOHN FORD DIETZ

VERSUS

ANNE BENNETT MORRISON DIETZ, ET AL.

AMY, J., concurring in the result.

I agree that an affirmation is warranted in this case. As reflected by this record, the parties have been involved in a patently contentious course of conduct that has resulted in damage-causing behavior. The trial court correctly recognized that such conduct, as proven in this case, is recoverable, whether particularly characterized as defamation or intentional infliction of emotional distress. Like the lead opinion, I note the lack of an identified civil remedy for the criminal claim of extortion. However, the record supports the trial court's statement that the related behavior, as described by the trial court, along with the specific conduct underlying the defamation claim, was undertaken so as to "cause the plaintiff to suffer severe emotional distress." In my opinion, this final finding reflects La.Civ.Code art. 2315's flexible and broad dictate that: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

Accordingly, I concur in the result.